# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NORTH CAROLINA
### CHARLOTTE DIVISION

| | |
|---|---|
| DANIEL TERWILLIGER, derivatively on behalf of DRIVEN BRANDS HOLDINGS INC., <br><br> Plaintiff, <br><br> vs. <br><br> JONATHAN FITZPATRICK, MICHAEL F. DIAMOND, MICHAEL BELAND, GARY FERRERA, DANIEL RIVERA, REBECCA FONDELL, CATHERINE HALLIGAN, RICK PUCKETT, MICHAEL THOMPSON, NEAL ARONSON, JOSE TOMÁS, DAMIEN HARMON, CHADWICK HUME, KAREN STROUP, and PETER SWINBURN, <br><br> Defendants, <br><br> and <br><br> DRIVEN BRANDS HOLDINGS INC., <br><br> Nominal Defendant. | Case No. <br><br><br><br> **DEMAND FOR JURY TRIAL** |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Daniel Terwilliger ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant Driven Brands Holdings Inc. ("Driven Brands" or the "Company"), files this Verified Shareholder Derivative Complaint against Jonathan Fitzpatrick ("Fitzpatrick"), Michael F. Diamond ("Diamond"), Michael Beland ("Beland"), Gary Ferrera ("Ferrera"), Daniel Rivera ("Rivera"), Rebecca Fondell ("Fondell"), Catherine Halligan ("Halligan"), Rick Puckett ("Puckett"), Michael Thompson ("Thompson"), Neal Aronson ("Aronson"), Jose Tomás ("Tomás"), Damien Harmon ("Harmon"), Chadwick Hume ("Hume"),

Karen Stroup ("Stroup"), and Peter Swinburn ("Swinburn") (collectively, the "Individual Defendants," and together with Driven Brands, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Driven Brands, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, for violations of Sections 10(b), 14(a), and 20(a) of Securities Exchange Act of 1934 (the "Exchange Act"), and for contribution under Sections 10(b) and 21D of the Exchange Act against Defendants Fitzpatrick, Diamond, Beland, Ferrera, Rivera, and Fondell. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by the Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Driven Brands, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## **NATURE OF THE ACTION**

1. This is a shareholder derivative action that seeks to remedy wrongdoing committed by Driven Brands's officers and directors from May 3, 2023 to February 24, 2026, inclusive (the "Relevant Period").

2. Driven Brands is a Delaware corporation with principal executive offices in Charlotte, North Carolina that is chiefly engaged in the automotive services industry. The services the Company provides address a wide range of automotive needs, including paint, collision, glass and repair services, among others. The Company's portfolio includes a number of well-known

brands such as Take 5 Oil Change, AutoGlassNow, and Meineke Car Care Center.

3. Throughout the Relevant Period, the Individual Defendants obfuscated ongoing issues and inadequacies in the Company's internal controls and its subsequent effects on the Company's financial reporting. At the same time, the Individual Defendants assured the investing public of the strength of the Company's internal controls and its overall financial stability, including with respect to its purportedly dependable business strategy focused on cash generation and growth.

4. The truth fully emerged on February 25, 2026, when the Company filed a Form 8-K with the SEC revealing that its financial statements for Fiscal Years 2023 and 2024[1] along with the first three quarters of Fiscal Year 2025, contained material errors. The Company further revealed that these financial statements "should not be relied upon" and would need to be restated, and that Driven Brands had "identified material weaknesses in the Company's internal control over financial reporting" and determined that its "internal control over financial reporting and disclosure controls and procedures were not effective as of December 27, 2025."

5. Later that day, the Company filed a second Form 8-K with the SEC, further revealing that Driven Brands would delay the filing of its Form 10-K for Fiscal Year 2025 due to the need to restate its financials for the aforementioned periods.

6. On this news, the price of the Company's common stock dropped $5.01 per share, or approximately 30.1%, from a closing price of $16.61 per share on February 24, 2026 to close at $11.60 per share on February 25, 2026.

---

[1] The Company does not follow the calendar year but instead operates on a 52 week or 53 week year. For the fiscal year from January 1, 2023 to December 30, 2023, "Fiscal Year 2023." For the fiscal year from December 31, 2023 to December 28, 2024, "Fiscal Year 2024." For the fiscal year from December 29, 2024 to December 27, 2025, "Fiscal Year 2025."

7. Throughout the Relevant Period, the Individual Defendants made materially false and misleading statements and failed to disclose, *inter alia*, that: (1) Driven had material weaknesses in its internal controls over financial reporting; (2) at least ten different categories of errors were widespread in the Company's financial reporting; (3) as a result, the Company's financial statements for Fiscal Years 2023 and 2024 and for the first three quarters of Fiscal Year 2025 contained material errors; (4) the affected statements would need to be restated and the filing of the Company's Annual Report on Form 10-K would be delayed; and (5) as a result of the foregoing, the Company's statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

8. The Individual Defendants also breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and misleading statements and omissions of material fact.

9. In addition, during the Relevant Period, the Individual Defendants breached their fiduciary duties by failing to maintain adequate internal controls while Defendants Fitzpatrick and Halligan engaged in improper insider sales while the Company's stock price was artificially inflated, netting combined total proceeds of approximately $3.4 million.

10. The Individual Defendants further breached their fiduciary duties by causing Driven Brands to repurchase its own stock at artificially inflated prices. Indeed, between August 2023 and September 2023, approximately 3.6 million shares of Driven Brands common stock were repurchased, costing the Company approximately $50 million. Since the repurchased stock was only worth $11.60 per share, which was the adjusted price at close of trading on February 25, 2026, Driven Brands overpaid for repurchases of its own common stock by approximately $8.2 million.

11. In light of the Individual Defendants' misconduct—which has subjected the

Company, its President and Chief Executive Officer ("CEO"), its former President and CEO, its Executive Vice President ("EVP") and Chief Financial Officer ("CFO"), its Senior Vice President ("SVP") and its Chief Accounting Officer ("CAO") to a federal securities fraud class action lawsuit pending in the United States District Court for the Western District of North Carolina (the "Securities Class Action"), the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars. The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

12.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action, of Defendants Fitzpatrick's, Diamond's, Beland's, Ferrera's, Rivera's, and Fondell's liability in the Securities Class Action, and of their not being disinterested and/or independent directors, a majority of the Company's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, Section 10(b) and 20(a) of the

Exchange Act (15 U.S.C. § 78j(b)), SEC Rule 10b-5 (17 C.F.R §240.10b-5) promulgated thereunder, and Section 21D of the Exchange Act (15 U.S.C. §78u-4(f)). Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

14. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

15. This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

16. Venue is proper in this District because the alleged misstatements and wrongs complained of herein entered this District, the Defendants have conducted business and are headquartered in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

17. Plaintiff is a current shareholder of Driven Brands. Plaintiff has continuously held shares of Driven Brands common stock at all relevant times.

### Nominal Defendant Driven Brands

18. Driven Brands is a Delaware corporation with principal executive offices at 440 South Church Street, Suite 700, Charlotte, North Carolina 28202. Driven Brands's common stock trades on the Nasdaq Global Select Market ("NASDAQ") under the ticker symbol "DRVN."

### Defendant Fitzpatrick

19. Defendant Fitzpatrick serves as the Board's Non-Executive Chair and has served as a Company director since April 2018. Defendant Fitzpatrick previously served as the Company's President and CEO from July 2012 to May 2025.

20. During the Relevant Period, while the Company's stock price was artificially

inflated and before the scheme was exposed, Defendant Fitzpatrick made the following sales of

Company common stock:

| Date | Number of Shares | Avg. Price/ Share ($) | Proceeds ($) |
|---|---|---|---|
| September 12, 2025 | 75,000 | $18.27 | $1,370,250 |
| September 15, 2025 | 110,000 | $18.05 | $1,985,500 |

Thus, in total, before the fraud was exposed, Defendant Fitzpatrick sold 185,000 shares of

Company stock on inside information, for which he received approximately $3.4 million in total

proceeds. His insider sales, made with knowledge of material nonpublic information before the

material misstatements and omissions were exposed, demonstrate his motive in facilitating and

participating in the scheme.

21.     The Schedule 14A the Company filed with the SEC on April 10, 2025 (the "2025

Proxy Statement") stated the following about Defendant Fitzpatrick:

*Jonathan Fitzpatrick* serves as our President, Chief Executive Officer, and a member of our Board of Directors. Mr. Fitzpatrick has served as our President and Chief Executive Officer since July 2012, as a member of our Board of Directors since April 2018, and previously served as a member of the board of managers of Driven Investor LLC. Mr. Fitzpatrick currently serves as a member of the board of directors of Nothing Bundt Cakes, a gourmet bakery, privately held by affiliates of Roark. Prior to joining the Company, Mr. Fitzpatrick served in various capacities with Burger King Corporation (a fast food restaurant company) both prior to and after its acquisition by 3G Capital (a global investment firm). Between February 2011 and June 2012, he was Executive Vice President, Chief Brand and Operations Officer for Burger King. From October 2010 to February 2011, he was Executive Vice President of Global Operations and between August 2009 and October 2010, Senior Vice President of Operations, Europe, Middle East, and Africa. Prior to this role, he was Senior Vice President, Development and Franchising from July 2007 through August 2009. Mr. Fitzpatrick earned a Bachelor's and Graduate degree from University College in Dublin, Ireland.

*Qualifications:* Mr. Fitzpatrick's experience as the President and Chief Executive Officer of Driven Brands, as well as his extensive knowledge and leadership experience with franchise companies, provide him with the qualifications and skills to serve as a director.

**Defendant Diamond**

22. Defendant Diamond has served as the Company's Executive Vice President and CFO since August 2024.

23. The Company's website[2] states the following about Defendant Diamond:

Mike Diamond is Executive Vice President and Chief Financial Officer where he is responsible for finance and accounting, tax, treasury, internal audit, and investor relations.

Before joining Driven Brands, he served as Executive Vice President and CFO of The Michaels Companies from August 2020 through July 2024. Prior to Michaels, he spent six years at Yum! Brands in roles of increasing responsibility, including as CFO, Pizza Hut U.S. and Chief Growth Officer, Pizza Hut U.K. and Europe.

Diamond spent four years as a consultant and project leader for The Boston Consulting Group and two years as a private equity analyst for Svoboda Capital Partners. He began his career as an investment banking analyst at Merrill Lynch & Co.

He earned a Bachelor of Business Administration with majors in Finance and French from the University of Notre Dame and a Master of Business Administration from Harvard University.

**Defendant Beland**

24. Defendant Beland served as the Company's Interim Principal Financial Officer from May 2024 to August 2024. Prior to that, he served as the Company's former Senior Vice President and Chief Accounting Officer from July 2021 to January 2025.

**Defendant Ferrera**

25. Defendant Ferrera served as the Company's Executive Vice President and CFO from May 2023 to May 8, 2024.

**Defendant Rivera**

---

[2] https://investors.drivenbrands.com/governance/board-of-directors/person-details/default.aspx?ItemId=b811d852-3c16-4e3d-bc41-cdbf0256e789

26.    Defendant Rivera has served as the Company's President and CEO since May 2025. Defendant Rivera has also served as a Company director since May 2025. Prior to this, Defendant Rivera served as the Company's Chief Operating Officer from February 2023 to May 2025 and as the Company's Chief Information Officer from November 2012 to February 2023.

27.    The Company's website[3] states the following about Defendant Rivera:

Daniel Rivera is the President and Chief Executive Officer of Driven Brands. He joined Driven Brands in November 2012 as Chief Information Officer. In 2014, Rivera was named Meineke Brand President. In 2020, Rivera was named Group President of the Maintenance segment and President of Take 5 Oil Change. He served as Chief Operating Officer from February 2023 to May 2025.

Previously, Rivera was the Senior Director of Application Development, Business Intelligence, Infrastructure, and Security at AutoNation. Prior to his role at AutoNation, he worked at some of the largest companies in the world, including GE, Motorola, and Burger King Corporation.

Rivera holds two degrees from Florida International University. He received a Bachelor of Science degree in computer engineering, cum laude, and he holds a Juris Doctorate.

**Defendant Fondell**

28.    Defendant Fondell has served as the Company's CAO since May 2025.

**Defendant Halligan**

29.    Defendant Halligan has served as a Company director since December 2020. Defendant Halligan also serves as a member of the Nominating and Corporate Governance Committee and as Chair of the Compensation Committee.

30.    During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Halligan made the following sales of Company common stock:

| Date | Number | Avg. Price/ | Proceeds ($) |
|---|---|---|---|

---

[3] https://investors.drivenbrands.com/governance/board-of-directors/person-details/default.aspx?ItemId=a1594f05-e3b6-4421-8fea-f49a83ef3831

9

| | of Shares | Share ($) | |
|---|---|---|---|
| March 3, 2025 | 4,242 | $17.42 | $73,895 |

Thus, in total, before the fraud was exposed, Defendant Halligan sold 4,242 shares of Company stock on inside information, for which she received approximately $73,895 in total proceeds. Her insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate her motive in facilitating and participating in the scheme.

31. The 2025 Proxy Statement stated the following about Defendant Halligan:

***Catherine (Cathy) Halligan*** became a member of our Board of Directors in December 2020 and previously served as a member of the board of managers of Driven Investor LLC. Ms. Halligan served as an Advisor from January to April 2012 and Senior Vice President, Sales & Marketing from July 2010 to December 2011 of PowerReviews Inc. (a leading SaaS software for customer reviews and social commerce) and prior to joining PowerReviews Inc., from 2005 to 2010, she held senior executive marketing and e-commerce roles at Walmart, including Chief Marketing Officer of Walmart.com from 2007 to 2009 and as Vice President Market Development, Global eCommerce from 2009 to 2010. Ms. Halligan also held executive roles at Williams-Sonoma, Inc., Blue Nile, and Gymboree. Ms. Halligan also serves as a director for Ferguson plc (a North American value-added distributor of infrastructure, plumbing, and HVAC products) where she serves on the Audit and Compensation Committees, Ulta Beauty Inc. (a retailer of All Things Beauty All In One Place), where she serves as a member of the Compensation and Nominating and Governance Committees, and Jeld-Wen Holding, Inc. (a leading global manufacturer of high performance interior and exterior building products) where she serves as the Chair of the Compensation Committee and as a member of the Audit Committee. She previously served as a director of FLIR Systems Inc. (a producer of thermal imaging cameras, components, and imaging sensors), where she chaired the Compensation Committee and was a member of the Audit Committee from 2014 to 2021. Ms. Halligan received a B.S. from Northern Illinois University.

***Qualifications:*** Ms. Halligan's extensive board experience and experience in digital transformation, marketing, and retail provide her with the qualifications and skills to serve as a director.

**Defendant Puckett**

32. Defendant Puckett has served as a Company director since December 2020. Defendant Puckett also serves as a member of the Compensation Committee and as Chair of the Audit Committee.

33. The 2025 Proxy Statement stated the following about Defendant Puckett:

*Rick Puckett* became a member of our Board of Directors in December 2020 and previously served as a member of the board of managers of Driven Investor LLC. From December 2006 to December 2016, Mr. Puckett was the Executive Vice President, Chief Financial Officer and Chief Administrative Officer of Snyder's-Lance, Inc. (a snack food products company). Prior to Snyder's-Lance, Mr. Puckett was Executive Vice President, Chief Financial Officer and Treasurer of United Natural Foods, Inc. (a North American food wholesaler). Mr. Puckett serves as a director, chairman of the Compensation Committee, and a member of the Audit Committee for SPX Corporation (a supplier of highly engineered infrastructure equipment technologies) and as a director, chairman of the Audit Committee, and a member of the Compensation and Nominating and Corporate Governance Committees of Whitehorse Finance, Inc. (an investment company), positions he has held since May 2016 and December 2012, respectively. Mr. Puckett served as a member of the Board of Directors for Pet Valu, Inc., (a pet specialty retailer company, from August 2019 to May 2023) where he served as the Chairman of the Audit Committee. He also served on the Board of Directors for Late July Brands, a privately-held food company, from 2007 through 2010. Mr. Puckett is a Certified Public Accountant, and he received a B.S. in Accounting and an M.B.A. from the University of Kentucky.

*Qualifications:* Mr. Puckett's experience in leadership roles at his past companies, significant knowledge and understanding of corporate finance and financial reporting, and his expert background as a Certified Public Accountant provide him with the qualifications and skills to serve as a director.

**Defendant Thompson**

34. Defendant Thompson has served as a Company director since December 2020.

35. The 2025 Proxy Statement stated the following about Defendant Thompson:

*Michael Thompson* became a member of our Board of Directors in December 2020 and previously served as a member of the board of managers of Driven Investor LLC. Mr. Thompson joined Roark Capital Management, LLC ("Roark") (a private equity firm) in 2010 and currently serves as a Managing Director. Prior to joining Roark, Mr. Thompson worked at Montage Partners (Phoenix-based private equity firm). Before Montage, Mr. Thompson served as a Senior Associate at Kroll Zolfo Copper (a financial advising company). Mr. Thompson received a B.A. from Pomona College and an M.B.A. from the University of Chicago Booth School of

Business. Mr. Thompson is a designated director nominee by Driven Equity LLC and RC IV Cayman ICW Holdings LLC (collectively, our "Principal Stockholders") under the Stockholders Agreement (as defined below).

*Qualifications:* Mr. Thompson's involvement with his respective firms' investments in various companies, in-depth knowledge, and industry experience, coupled with his skills in private financing and strategic planning, provide him with the qualifications and skills to serve as a director.

**Defendant Aronson**

36. Defendant Aronson has served as a Company director since December 2020 and previously served as Chairman of the Board from January 2021 to May 2025.

37. The 2025 Proxy Statement stated the following about Defendant Aronson:

*Neal Aronson* became a member of our Board of Directors in December 2020, previously served as a member of the board of managers of Driven Investor LLC, and has served as chairman of our Board of Directors since the consummation of our initial public offering in January 2021 ("IPO"). Mr. Aronson founded Roark, and serves as its Managing Partner, a position he has held since 2001. Prior to founding Roark, Mr. Aronson was Co-Founder and Chief Financial Officer for U.S. Franchise Systems, Inc., or USFS, a franchisor of hotel chains. Prior to USFS, Mr. Aronson was a private equity professional at Rosecliff (a successor company to Acadia Partners), Odyssey Partners (a private equity firm), and Acadia Partners (now Oak Hill, an investment firm). Mr. Aronson began his career in the corporate finance department at Drexel, Burnham, Lambert Inc. (a former investment bank). Mr. Aronson received a B.A. from Lehigh University. Mr. Aronson is a designated director by our Principal Stockholders under the Stockholders Agreement (as defined below).

*Qualifications*: Mr. Aronson's experience as a private equity partner, chief financial officer, and in other senior executive leadership roles working with franchise companies in the retail, consumer, and business services industries, and knowledge of complex financial matters provide him with valuable and relevant experience in franchise administration, strategic planning, corporate finance, financial reporting, mergers and acquisitions, and leadership of complex organizations, and provide him with the qualifications and skills to serve as a director.

**Defendant Tomás**

38. Defendant Tomás has served as a Company director since July 2022. He also serves as a member of the Compensation Committee and the Nominating and Corporate Governance

Committee.

39.     The 2025 Proxy Statement stated the following about Defendant Tomás:

***Jose Tomás*** became a member of our Board of Directors in July 2022. Since 2021, Mr. Tomás has served as the Chief Administrative Officer at TelevisaUnivision Inc., the leading Spanish-language media and content company in the world. In this role, he oversees strategic functions essential to TelevisaUnivision's success, including Human Resources; Corporate Communications; Facilities/Real Estate; Social Impact; Diversity, Equity and Inclusion; and Corporate Safety, Health and Security. From 2018 to 2021, he served as co-founder and managing partner of BrandSparc, a global communications, branding and human resources firm. From 2017 to 2018, he was a member of General Motors' global senior executive leadership team where he served as Senior Vice President of Global Human Resources.

Mr. Tomás also served as Executive Vice President and Chief Human Resources Officer at Anthem, Inc. from 2013 to 2017. In this role, he was responsible for Human Resources; Corporate Communications; Diversity, Equity and Inclusion; and Corporate Security.

Previously, Mr. Tomás held senior operations and administrative roles at Burger King Corporation, where he served as both president, Latin America and Caribbean region, and Global Chief People Officer. Mr. Tomás has also held human resources positions with Ryder System Inc., and operations and Human Resources roles at Publix Super Markets.

Mr. Tomás holds a bachelor's degree in business administration and a master's in management from Florida International University.

***Qualifications:*** Mr. Tomás's experience as a leader with large organizations with expertise in operations, people, and culture provide him with the qualifications to be a director.

**Defendant Harmon**

40.     Defendant Harmon has served as a Company director since January 2024. He also serves as a member of the Compensation Committee.

41.     The 2025 Proxy Statement stated the following about Defendant Harmon:

***Damien Harmon*** became a member of our Board of Directors in January 2024. He has served as the Senior Executive Vice President of Customer, Channel Experiences & Enterprise Services for Best Buy Co., Inc., a consumer electronics retailer, since April 2023. In this role, he is responsible for the end-to-end customer experience and the work that enhances every interaction with Best Buy customers

and its employees. His areas of responsibility include stores and operations, in-home services and sales, virtual experiences, call centers, membership, and customer strategy, relationship offerings and insights. He also leads Geek Squad, Best Buy's national tech-support organization dedicated to helping customers learn about and enjoy their technology. Prior to his current role, Harmon served as Best Buy's Executive Vice President of Omnichannel from 2021 to 2023 where he established a dedicated operations plan to enhance the company's ability to create seamless experiences for Best Buy customers, as President of Operations from 2020 to 2021, and as Senior Vice President of Workforce Design from 2019 to 2020. In addition to his time at Best Buy, he has held executive-level roles at Bridgestone Americas Inc., including serving as President of GCR Commercial Tires and as the Chief Operating Officer of Bridgestone Retail Operations. He holds a Bachelor's Degree in Management from the University of Phoenix.

*Qualifications:* Mr. Harmon's deep experience in competitive and evolving retail environments and in delivering exceptional customer experiences provides him with the qualifications and skills to serve as a director.

**Defendant Hume**

42. Defendant Hume has served as a Company director since December 2020.

43. The 2025 Proxy Statement stated the following about Defendant Hume:

*Chadwick (Chad) Hume* became a member of our Board of Directors in December 2020 and previously served as a member of the board of managers of Driven Investor LLC. Mr. Hume joined Roark in 2009 and currently serves as a Principal. Prior to joining Roark, Mr. Hume worked at Houlihan Lokey (an investment bank) and Bank of America (a financial services company). Mr. Hume received a B.B.A. from the Terry College of Business at the University of Georgia. Mr. Hume is a designated director by our Principal Stockholders under the Stockholders Agreement.

*Qualifications:* Mr. Hume's experience with his firm's investments in branded consumer companies, expertise in corporate strategy and organization, and relevant experience in the industry provide him with the qualifications and skills to serve as a director.

**Defendant Stroup**

44. Defendant Stroup has served as a Company director since December 2020. She also serves as a member of the Audit Committee and Compensation Committee.

45. The 2025 Proxy Statement stated the following about Defendant Stroup:

*Karen Stroup* became a member of our Board of Directors in December 2020 and

previously served as a member of the board of managers of Driven Investor LLC. Ms. Stroup currently serves as the Chief Digital Officer of WEX, Inc. (a payments technology company), where she leads product management, design, data & analytics, and WEX's customer and digital transformation. Prior to WEX, Ms. Stroup was the Chief Digital Officer at Thomson Reuters (a multinational media conglomerate) from 2019 to 2021, where she led Thomson Reuters's end-to-end transformation to be a global digital company, leveraging data and shared capabilities to improve Net Promoter Score, grow revenue and improve sales and marketing efficiency. Prior to joining Thomson Reuters, Ms. Stroup has also served as Director, Digital BCG Accelerator for The Boston Consulting Group, Chief Digital Officer at TreeHouse (a home upgrade company) in 2018, as Senior Vice President, The Garage at Capital One Financial Corporation (a bank holding company) from 2016 to 2018, and as Vice President, Product Management at Intuit, Inc. (a financial software company) from 2007 to 2016. Ms. Stroup received a B.B.A. from the University of Notre Dame and an M.B.A. from Dartmouth College.

*Qualifications:* Ms. Stroup's experience in leading digital transformations and delivering results leveraging customer-driven innovation provide her with the qualifications and skills to serve as a director.

**Defendant Swinburn**

46. Defendant Swinburn has served as a Company director since December 2020. He also serves as a member of the Audit Committee and as Chair of the Nominating and Corporate Governance Committee.

47. The 2025 Proxy Statement stated the following about Defendant Swinburn:

*Peter Swinburn* became a member of our Board of Directors in December 2020 and previously served as a member of the board of managers of Driven Investor LLC. Mr. Swinburn served as the Chief Executive Officer of Molson Coors (a multinational drink and brewing company) from 2008 to 2014. He currently serves on the boards of Express Inc. (a specialty retail apparel chain) where he is the Chair of the Compensation and Nominating and Governance Committee. Mr. Swinburn also sits on the boards of Wales Millennium Centre (an arts center), and The Rise (a housing development company) each, a privately-held company. Mr. Swinburn previously served as a director for Cabela's Inc. (a specialty retailer of outdoor recreation merchandise), from 2015 to 2021, High Level Software Ltd. (a software company), and Fuller Smith & Turner (a brewing company). Mr. Swinburn received a B.Sc. from University of Wales, Cardiff.

*Qualifications:* Mr. Swinburn's extensive board experience and significant knowledge and understanding of business development, strategic planning, and consumer brand marketing provide him with the qualifications and skills to serve

as a director.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

48. By reason of their positions as officers, directors, and/or fiduciaries of Driven Brands and because of their ability to control the business and corporate affairs of Driven Brands, the Individual Defendants owed Driven Brands and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Driven Brands in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Driven Brands and its shareholders so as to benefit all shareholders equally.

49. Each director and officer of the Company owes to Driven Brands and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

50. The Individual Defendants, because of their positions of control and authority as directors and/or officers of Driven Brands, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

51. To discharge their duties, the officers and directors of Driven Brands were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

52. Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable

violation of their obligations as directors and officers of Driven Brands, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised Driven Brands's Board at all relevant times.

53. As senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

54. To discharge their duties, the officers and directors of Driven Brands were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Driven Brands were required to, among other things:

(a) ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, North Carolina, and the United

States, and pursuant to Driven Brands's own Code of Conduct and Ethics (the "Code of Conduct");

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how Driven Brands conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of Driven Brands and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Driven Brands's operations would comply with all applicable laws and Driven Brands's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and make full and accurate disclosure

of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

55. Each of the Individual Defendants further owed to Driven Brands and the shareholders the duty of loyalty requiring that each favor Driven Brands's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

56. At all times relevant hereto, the Individual Defendants were the agents of each other and of Driven Brands and were at all times acting within the course and scope of such agency.

57. Because of their advisory, executive, managerial, directorial, and controlling positions with Driven Brands, each of the Individual Defendants had access to adverse, non-public information about the Company.

58. The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Driven Brands.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

59. In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

60. The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (1) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act; (2) conceal adverse information concerning the Company's operations, financial condition, legal

compliance, future business prospects, and internal controls; and (3) artificially inflate the Company's stock price.

61. The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Driven Brands was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

62. Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

63. At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Driven Brands and was at all times acting within the course and scope of such agency.

**DRIVEN BRANDS'S CODE OF CONDUCT**

64. The Introduction to the Company's Code of Conduct states that the Company "requires the highest standards of professional and ethical conduct from [its] employees, officers and directors." It further adds that "[n]o employee, officer or director may achieve results through

violations of laws or regulations or unscrupulous dealings. No individual, regardless of stature or position, can authorize actions that are illegal, or that jeopardize or violate Company policies."

65.     The Introduction section continues by establishing that the "[t]his Code reflects . . . policies with which all employees, officers and directors are expected to comply."

66.     Under the section titled "Conflicts of Interest," the Code of Conduct provides that Company employees, officers, and directors:

> "[] must avoid any relationship or activity that could affect your independent judgment in the conduct of Company business or conflicts with or could reasonably give the appearance of conflicting with Company interests. In assessing whether a situation poses a conflict of interest, the Company will examine whether your interest or activity could influence, or could give the appearance of influencing, your decisions on behalf of the Company.

67.     Under the section titled "Corporate Opportunities," the Code of Conduct states the following:

> When carrying out your duties or responsibilities, you owe a duty to the Company to advance its legitimate interests. Except as provided in the Company's constituent documents, employees, directors and officers are prohibited from (i) taking for themselves opportunities that arise through the use of corporate property, information or position, (ii) using corporate property, information or position for personal gain and (iii) competing with the Company.

68.     Moreover, under the section titled "Public Reporting," the Code of Conduct provides the following, in pertinent part:

> Full, fair, accurate and timely disclosure must be made in the reports and other documents that the Company files with, or submits to, the SEC and in its other public communications. Such disclosure is critical to ensure that the Company maintains its good reputation, complies with its obligations under the securities laws and meets the expectations of its stockholders.

69.     Under the same section, the Code of Conduct continues by providing the following:

> Persons responsible for the preparation of such documents and reports and other public communications must exercise the highest standard of care in accordance with the following guidelines:
>
> - all accounting records, and the reports produced from such records, must

comply with all applicable laws;

- all accounting records must fairly and accurately reflect the transactions or occurrences to which they relate;
- all accounting records must fairly and accurately reflect in reasonable detail the Company's assets, liabilities, revenues and expenses;
- accounting records must not contain any false or intentionally misleading entries;
- no transactions should be intentionally misclassified as to accounts, departments or accounting periods;
- all transactions must be supported by accurate documentation in reasonable detail and recorded in the proper account and in the proper accounting period;
- no information should be concealed from the internal audit department or the independent registered public accounting firm; and compliance with the Company's internal control over financial reporting and disclosure controls and procedures is required.

70. Under the section titled "Protection and Proper Use of Company Assets," the Code of Conduct states the following, in relevant part:

All employees, officers and directors should promote and ensure the efficient and responsible use of the Company's assets and resources by the Company. Theft, carelessness and waste have a direct impact on the Company's profitability. Any suspected incidents of fraud or theft should be immediately reported for investigation using one of the reporting methods provided in Section XVIII below.

71. Under the section titled "Insider Trading," the Code of Conduct states the following:

Insider trading is unethical and illegal. Employees, officers and directors must not trade in securities of a company while in possession of material non-public information regarding that company. It is also illegal to "tip" or pass on inside information to any other person who might make an investment decision based on that information or pass the information to third parties. The Company has a Securities Trading Policy, which sets forth obligations in respect of trading in the Company's securities.

72. Under the section titled "Fair Dealing," the Code of Conduct states that "[n]o employee, officer or director should take unfair advantage of anyone through illegal conduct, manipulation, concealment, abuse of privileged information, misrepresentation of material facts or any other unfair-dealing practice."

73. Furthermore, under the section titled "Compliance with Laws, Rules and Regulations," the Code of Conduct states the following:

Compliance with both the letter and spirit of all laws, rules and regulations applicable to the Company, including any securities exchange or other organization or body that regulates the Company, is critical to our reputation and continued success. All employees, officers and directors must respect and obey the laws of the cities, states and countries in which the Company operates and avoid even the appearance of impropriety. Employees, officers or directors who fail to comply with this Code and applicable laws will be subject to disciplinary measures, up to and including discharge from the Company.

74. Under the section titled "Procedures for Reporting and Investigating Potential Code Violations and Other Misconduct," and under the subsection "Asking Questions About, or Reporting, Violations and Misconduct," the Code of Conduct states the following, in relevant part:

The Company proactively promotes ethical behavior and encourages you promptly to report evidence of illegal or unethical behavior, or any potential or actual misconduct or violation of this Code. Similarly, we encourage you to ask questions about this Code as the need arises.

75. In violation of the Code of Conduct, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and violations of the Exchange Act. Also, the Individual Defendants failed to maintain internal controls, failed to obtain waivers and/or failed to disclose obtained waivers of violating the Code of Conduct, and failed to comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct.

## DRIVEN BRANDS'S AUDIT COMMITTEE CHARTER

76. The Company also maintains an Audit Committee Charter. Under the section titled "Purpose and Mission," the Audit Committee Charter states the following, in relevant part:

The purpose of the Audit Committee (the "Committee") of the Board of Directors (the "Board") of Driven Brands Holdings Inc. (the "Company") is to provide assistance to the Board in fulfilling its legal and fiduciary obligations with respect to matters involving the accounting, auditing, financial reporting, internal control, risk management and legal compliance functions of the Company. This includes, without limitation, (a) assisting the Board with its oversight of (i) the accounting and financial reporting processes and internal controls of the Company and its subsidiaries, including the audits of the Company's financial statements and the integrity of the Company's financial statements, (ii) the Company's compliance with legal and regulatory requirements, (iii) the Company's independent registered public accounting firm's qualifications and independence and (iv) the performance of the Company's independent registered public accounting firm and the Company's internal audit function, and (b) preparing the report required to be prepared by the Committee pursuant to the rules of the Securities and Exchange Commission (the "SEC") for inclusion in the Company's annual proxy statement.

77. Under a section titled "Duties and Responsibilities of the Committee," in a subsection titled "Financial Reporting," the Audit Committee Charter states the following in relevant part:

Although the Committee has the powers and responsibilities set forth in this Charter, the role of the Committee is oversight. Consequently, it is not the duty of the Committee to conduct audits or to determine that the Company's financial statements and disclosures are complete and accurate and are in accordance with Generally Accepted Accounting Principles ("GAAP") and other applicable requirements. These are the responsibilities of management and the Company's independent registered public accounting firm.

78. The same section also provides that the Audit Committee's "policies and procedures should remain flexible, so that it may be in a position to best respond to changing circumstances or conditions."

79. Under the same section, the Audit Committee Charter further notes that the following are within the authority of the Audit Committee, in relevant part:

(a) Obtain and review at least annually the Company's control environment, risk assessment, internal audit plan, and internal audit budget;

(b) Review with the head of internal audit the staffing, audit procedures to be utilized and the coordination of the plan with the independent registered public accounting firm. During this review the independence, objectivity and authority of

the internal audit department will be assessed;

(c) Review results of internal audits and the remediation status of audit findings quarterly. Additionally, periodically review with the head of internal audit any significant difficulties, disagreements with management or scope restrictions encountered in the course of the internal audit department's work;

(d) Review and advise on the selection or removal of the head of internal audit. Additionally, review activities, organizational structure and qualifications of the internal audit department;

***

(m) Review the results of the year-end audit of the Company by the Company's independent registered public accounting firm, including any significant matters regarding internal controls over financial reporting that have come to their attention during the conduct of their audit;

(n) Review and discuss with management and the Company's independent registered public accounting firm the Company's annual audited financial statements and related disclosures under the "Management's Discussion and Analysis of Financial Condition and Results of Operations" section , prior to including within the Company's Annual Report on Form 10-K;

(o) Recommend to the Board whether the Company's annual audited financial statements should be included in the Company's annual report on Form 10-K for filing with the SEC and timely prepare an audit committee report required by the SEC to be included in the Company's annual proxy statement;

(p) Review and discuss with management and the Company's independent registered public accounting firm, the Company's quarterly financial statements and related disclosures under the "Management's Discussion and Analysis of Financial Condition and Results of Operations" section and the results of the Company's independent registered public accounting firm's review of the quarterly financial statements prior to including within the Company's Quarterly Reports on Form 10-Q;

80. In the same section, the Audit Committee Charter further states that the following are within the authority of the Audit Committee:

(r) Review with management, the Company's independent registered public accounting firm and the head of the Company's internal audit department, the following:

i. critical accounting policies and such other accounting policies of the

Company as are deemed appropriate for review by the Committee prior to any filings with the SEC or other regulatory body, including any financial reporting issues which could have a material impact on the Company's financial statements;

ii. major issues regarding, or any significant changes in, the Company's selection or application of accounting standards and principles and the Company's financial statement preparations;

iii. alternative treatments of financial information that have been discussed by the Company's independent registered public accounting firm and management, ramifications of the use of such alternative disclosures and treatments and the treatment preferred by the Company's independent registered public accounting firm;

\*\*\*

(s) Review with the chief executive officer and chief financial officer and Company's independent registered public accounting firm, quarterly, the following:

i. all significant deficiencies in the design or operation of internal controls which could adversely affect the Company's ability to record, process, summarize, and report financial data, including any material weaknesses in internal controls identified by the Company's management, internal audit or independent registered public accounting firm; and

ii. any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal controls;

81. Defendants Puckett (as Chair), Stroup, and Swinburn violated the Audit Committee Charter by engaging in or permitting the Company to engage in the scheme to issue materially false and misleading statements to the investing public and by facilitating and disguising the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, gross mismanagement, abuse of control, waste of corporate assets, and violations of the Exchange Act. In addition, the Individual Defendants who served on the Company's Audit Committee during the Relevant Period violated the Audit Committee Charter by failing to adequately oversee the integrity of the Company's financial disclosures, failing to adequately oversee the Company's compliance with legal and regulatory requirements, failing to oversee risks related to financial

reporting, internal controls, and internal information systems, failing to adequately discuss with management the Company's financial information prior to public distribution, and failing to adequately oversee the Company's disclosure controls and procedures.

## THE INDIVIDUAL DEFENDANTS' MISCONDUCT

### *Relevant Background*

82.  Driven Brands is a Delaware corporation with its principal executive offices located in Charlotte, North Carolina. It is chiefly involved in the automotive services industry.

83.  The services the Company provides address a wide range of automotive needs including paint, collision, glass and repair services, among others. The Company is one of the largest providers of diversified automotive services in North America. In particular, the Company's portfolio includes a number of well-known brands such as Take 5 Oil Change, AutoGlassNow, and Meineke Car Care Center.

## FALSE AND MISLEADING STATEMENTS

### *May 3, 2023 Press Release*

84.  On May 3, 2023, the Company published a press release before the markets opened, announcing its financial results for the first quarterly period ended on April 1, 2023 ("Q1 2023") (the "Q1 2023 Press Release"). The Q1 2023 Press Release reported the following financial results:

**First Quarter 2023 Highlights**

Comparisons are first quarter of 2023 ended April 1, 2023 versus first quarter of 2022 ended March 26, 2022 unless otherwise noted

• Revenue increased 20 percent to $562.5 million, driven by same-store sales and net store growth.

• Consolidated same-store sales increased 9 percent.

• The Company added 59 net new stores during the quarter.

• Net Income decreased 14 percent to $29.7 million or $0.17 per diluted share.

• Adjusted Net Income[] decreased 11 percent to $42.3 million or $0.25 per diluted share

• Adjusted EBITDA[] increased 8 percent to $127.8 million.

***May 9, 2023 Form 10-Q***

85. On May 9, 2023, the Company filed a Form 10-Q with the SEC for Q1 2023 (the "Q1 2023 10-Q"). The Q1 2023 10-Q was signed by Defendants Fitzpatrick and Beland and attached certifications pursuant to Rules 13a-14(a) and 15(d)-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendant Fitzpatrick attesting to the accuracy of the Q1 2023 10-Q and that "the financial statements, and other financial information included in this report [Q1 2023 10-Q], fairly present, in all material respects, the financial condition, results of operations and cash flow of the Registrant [Company] . . . ."

86. The Q1 2023 10-Q also provided additional details on the Company's Q1 2023 financial results, including the following reported cash metrics:

| | |
|---|---:|
| Net change in cash, cash equivalents, restricted cash, and cash included in advertising fund assets, restricted | (34,014) |
| Cash and cash equivalents, beginning of period | 227,110 |
| Cash included in advertising fund assets, restricted, beginning of period | 32,871 |
| Restricted cash, beginning of period | 792 |
| Cash, cash equivalents, restricted cash, and cash included in advertising fund assets, restricted, beginning of period | 260,773 |
| Cash and cash equivalents, end of period | 190,841 |
| Cash included in advertising fund assets, restricted, end of period | 35,126 |
| Restricted cash, end of period | 792 |
| Cash, cash equivalents, restricted cash, and cash included in advertising fund assets, restricted, end of period | $ 226,759 |

87. The Q1 2023 10-Q also reported Q1 2023 "Company-operated store expenses" of $243.409 million and "[s]elling, general, and administrative expenses" of $112.328 million.

88. Moreover, the Q1 2023 10-Q represented that there were "no changes in our internal control over financial reporting that occurred during the three months ended April 1, 2023

that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting."

***August 9, 2023 Form 10-Q***

89. On August 9, 2023, the Company filed a Form 10-Q with the SEC for the second quarterly period ended on July 1, 2023 ("Q2 2023") (the "Q2 2023 10-Q"). The Q2 2023 10-Q was signed by Defendants Fitzpatrick and Beland and attached SOX certifications signed by Defendants Fitzpatrick and Ferrera attesting to the accuracy of the Q2 2023 10-Q and making substantially the same statements as set forth in ¶ 88.

90. The Q2 2023 10-Q also reported the following, in relevant part:

**Q2 2023 Three Months Ended Highlights and Key Performance Indicators**
*(as compared to same period in the prior year, unless otherwise noted)*

- Revenue increased 19% to $607 million, driven by same-store sales and net store growth.

- Consolidated same-store sales increased 8%.

- The Company added 74 net new stores during the quarter.

- Net Income increased to $38 million or $0.22 per diluted share in the current quarter compared to a Net Loss of $57 million or ($0.34) per diluted share in the prior year period.

- Adjusted Net Income "(non-GAAP)" decreased 18% to $49 million or $0.29 per diluted share.

- Adjusted EBITDA "(non-GAAP)" increased 12% to $151 million.

91. The Q2 2023 10-Q also reported the Company's cash metrics for the six months ended on July 1, 2023, as set forth below:

| | |
|---|---:|
| **Net change in cash, cash equivalents, restricted cash, and cash included in advertising fund assets, restricted** | (9,302) |
| Cash and cash equivalents, beginning of period | 227,110 |
| Cash included in advertising fund assets, restricted, beginning of period | 32,871 |
| Restricted cash, beginning of period | 792 |
| **Cash, cash equivalents, restricted cash, and cash included in advertising fund assets, restricted, beginning of period** | 260,773 |
| Cash and cash equivalents, end of period | 212,123 |
| Cash included in advertising fund assets, restricted, end of period | 38,691 |
| Restricted cash, end of period | 657 |
| **Cash, cash equivalents, restricted cash, and cash included in advertising fund assets, restricted, end of period** | $ 251,471 |

92. The Q2 2023 10-Q also reported Q2 2023 "Company-operated store expenses" of $257.040 million and "[s]elling, general, and administrative expenses" of $96.815 million.

93. Moreover, the Q2 2023 10-Q assured the investing public that there "were no changes in our internal control over financial reporting that occurred during . . . [the] quarter ended July 1, 2023 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting."

***November 9, 2023 Form 10-Q***

94. On November 9, 2023, the Company filed a Form 10-Q with the SEC for the third quarterly period ended on September 30, 2023 ("Q3 2023") (the "Q3 2023 10-Q"). The Q3 2023 10-Q was signed by Defendants Fitzpatrick and Beland and attached SOX certifications signed by Defendants Fitzpatrick and Ferrera attesting to the accuracy of the Q3 2023 10-Q and substantially the same statements as noted in ¶ 88.

95. The Q3 2023 10-Q boasted that the Company's revenue for Q3 2023 "increased 12% [year-over-year] to $581 million, driven by same-store sales and net store growth."

96. Additionally, the Q3 2023 10-Q reported the Company's cash metrics for the nine

months ended September 30, 2023 as follows:

| | |
|---|---|
| **Net change in cash, cash equivalents, restricted cash, and cash included in advertising fund assets, restricted** | (959) |
| Cash and cash equivalents, beginning of period | 227,110 |
| Cash included in advertising fund assets, restricted, beginning of period | 32,871 |
| Restricted cash, beginning of period | 792 |
| **Cash, cash equivalents, restricted cash, and cash included in advertising fund assets, restricted, beginning of period** | 260,773 |
| Cash and cash equivalents, end of period | 211,280 |
| Cash included in advertising fund assets, restricted, end of period | 47,877 |
| Restricted cash, end of period | 657 |
| **Cash, cash equivalents, restricted cash, and cash included in advertising fund assets, restricted, end of period** | $ 259,814 |

97. The Q3 2023 10-Q also reported Q3 2023 "Company-operated store expenses" of $262.282 million and "[s]elling, general, and administrative expenses" of $123.012 million.

98. Moreover, the Q3 2023 10-Q represented that there were "no changes in our internal control over financial reporting that occurred during the . . . quarter ended September 30, 2023 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting."

### *February 28, 2024 Form 10-K/A*

99. On February 28, 2024, the Company filed its amended Annual Report on Form 10-K/A with the SEC for Fiscal Year 2023 (the "2023 10-K/A"). The 2023 10-K/A was signed by Defendant Beland and attached SOX certifications signed by Defendants Fitzpatrick and Ferrera and attesting to the accuracy of the 2023 10-K/A and substantially the same statements as noted in ¶ 88.

100. Regarding the Company's net revenue for Fiscal Year 2023, the 2023 10-K/A reported the following:

| (in thousands, except per share amounts) | Year Ended | | |
|---|---|---|---|
| | December 30, 2023 | December 31, 2022 | December 25, 2021 |
| Net revenue: | | | |
| Franchise royalties and fees | $ 190,367 | $ 171,734 | $ 144,413 |
| Company-operated store sales | 1,526,353 | 1,324,408 | 843,646 |
| Independently-operated store sales | 196,395 | 195,157 | 204,246 |
| Advertising contributions | 98,850 | 87,750 | 75,599 |
| Supply and other revenue | 292,064 | 254,145 | 199,376 |
| Total net revenue | 2,304,029 | 2,033,194 | 1,467,280 |

101. Moreover, the 2023 10-K/A reported the following cash metrics for Fiscal Year 2023:

| | |
|---|---|
| Net change in cash, cash equivalents, restricted cash, and cash included in advertising fund assets, restricted | (45,057) |
| Cash and cash equivalents, beginning of period | 227,110 |
| Cash included in advertising fund assets, restricted, beginning of period | 32,871 |
| Restricted cash, beginning of period | 792 |
| Cash, cash equivalents, restricted cash, and cash included in advertising fund assets, restricted, beginning of period | 260,773 |
| Cash and cash equivalents, end of period | 176,522 |
| Cash included in advertising fund assets, restricted, end of period | 38,537 |
| Restricted cash, end of period | 657 |
| Cash, cash equivalents, restricted cash, and cash included in advertising fund assets, restricted, end of period | $ 215,716 |

102. Furthermore, the 2023 10-K/A reported Fiscal Year 2023 "Company-operated store expenses" of $1.004 billion and "[s]elling, general, and administrative expenses" of $443.112 million.

***2024 Proxy Statement***

103. On March 27, 2024, the Company filed a Schedule 14A with the SEC (the "2024 Proxy Statement"). Defendants Aronson, Fitzpatrick, Tomás, Halligan, Puckett, Thompson, Harmon, Hume, Stroup, and Swinburn solicited the 2024 Proxy Statement, pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

104. The 2024 Proxy Statement called for the Company's shareholders to vote, *inter alia*, to: (1) re-elect Defendants Aronson, Fitzpatrick, and Tomás to serve on the Board until the 2027 Annual Meeting of Stockholders; (2) approve, on an advisory basis, the compensation of the Company's named executive officers, (3) approve the amended and restated Driven Brands Holdings Inc. 2021 Omnibus Incentive Plan ("Amended Incentive Plan"); and (4) ratify the appointment of PricewaterhouseCoopers LLP ("PwC") as the Company's independent registered public accounting firm for Fiscal Year 2024.

105. The 2024 Proxy Statement noted that if approved, the Amended Incentive Plan would cause 10,000,000 shares to be made available under the plan. Per the 2024 Proxy Statement, as of March 22, 2024, there were 4,751,995 shares still available for grant under the Driven Brands 2021 Omnibus Incentive Plan ("2021 Incentive Plan"). The 2024 Proxy Statement stated that employees, directors, officers, and consultants were eligible to participate in the Amended Incentive Plan. It further noted that if the Amended Incentive Plan was not approved, the Company "will not have sufficient shares available to continue to make equity awards to eligible persons in the coming months."

106. Regarding the "Board's Oversight of Risk," the 2024 Proxy Statement stated that "[r]isk oversight is a critical aspect of the Company meeting its strategic objectives." It further provided the following:

**Board of Directors**
The Board of Directors executes its risk oversight responsibilities through active review and discussion of key risks facing the Company, including strategic risks, and delegating certain risk oversight responsibilities to its committees, who regularly report back to the Board of directors.

\*\*\*

**Audit Committee**
Oversees the management of financial risks, including accounting and financial

reporting processes, internal controls and internal audit functions, the fraud risk assessment program, the enterprise risk management program, and other risk exposures including data privacy and cybersecurity[.]

***

**Compensation Committee**

Oversees the management of risks relating to the Company's compensation plans and arrangements[.]

***

**Nominating & Corporate Governance Committee**

Oversees the management of risks related to the Company's corporate governance policies and practices and Board and executive succession planning[.]

(Emphasis in the original.)

107.  Regarding the "Code of Conduct and Ethics," the 2024 Proxy Statement provided:

Our Board of Directors adopted a Code of Conduct and Ethics that applies to all our directors, officers, and employees and is intended to comply with the relevant listing requirements for a code of conduct as well as qualify as a "code of ethics" as defined by SEC rules. The Code of Conduct and Ethics contains general guidelines for conducting our business consistent with the highest standards of business ethics. Our Code of Conduct and Ethics is supported by underlying policies. The Code of Conduct and Ethics is available under the Governance—Documents & Charters section of our website at https://investors.drivenbrands.com.[]

108.  Defendants Aronson, Fitzpatrick, Tomás, Halligan, Puckett, Thompson, Harmon, Hume, Stroup, and Swinburn caused the 2024 Proxy Statement to be false and misleading by failing to disclose, *inter alia*, that: (1) Driven had material weaknesses in its internal controls over financial reporting; (2) at least ten different categories of errors were widespread in the Company's financial reporting; (3) as a result, the Company's financial statements for Fiscal Years 2023 and 2024 and for the first three quarters of Fiscal Year 2025 contained material errors; (4) the affected statements would need to be restated and the filing of the Company's Annual Report on Form 10-K would be delayed; and (5) as a result of the foregoing, the Company's statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

109. The 2024 Proxy Statement also failed to disclose, *inter alia*, that: (1) although the Individual Defendants represented that the Company, its officers, and directors adhered to its Code of Conduct, the Individual Defendants violated these policies without waivers or without such waivers being disclosed; and (2) contrary to the 2024 Proxy Statement's descriptions of the Board's and its committees' oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements. As a result, the Individual Defendants' statements were materially false and misleading at all relevant times.

110. As a result of Defendants Aronson, Fitzpatrick, Tomás, Halligan, Puckett, Thompson, Harmon, Hume, Stroup, and Swinburn causing the 2024 Proxy Statement to be false and misleading, the Company shareholders, voted, *inter alia*, to: (1) re-elect Defendants Aronson, Fitzpatrick, Tomás to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company; (2) approve, on an advisory basis, the compensation of the Company's named executive officers; (3) approve the Amended Incentive Plan, thereby allowing the Individual Defendants to materially benefit thereunder in the future; and (4) ratify the appointment of PwC as the Company's independent registered public accounting firm for Fiscal Year 2024.

111. As a result of the Company's shareholders approving the Amended Incentive Plan, the plan took effect immediately upon reaching shareholder approval on May 9, 2024. An additional 10,000,000 shares were made available for grant, meaning there were 14,751,995 shares available for issuance under the Amended Incentive Plan. The Individual Defendants, many of whom are directors of the Company, received material personal benefits that they otherwise would not have received but for the issuance of the false and misleading 2024 Proxy Statement and the shareholders approving the Amended Incentive Plan. Moreover, certain of the Individual

Defendants continue to receive material personal benefits in the form of stock awards and will continue to receive material personal benefits in the form of stock awards under the Amended Incentive Plan in the future.

***May 2, 2024 Form 8-K***

112. On May 2, 2024, the Company filed a Form 8-K that announced Defendant Ferrera's resignation (the "May 2024 8-K"). Specifically, the May 2024 8-K stated that Defendant Ferrera "notified the Company of his intent to resign from the Company to pursue a professional opportunity at a privately held company." It further stated that Defendant Ferrera agreed to "continue service as Executive Vice President and Chief Financial Officer until the filing of the Company's quarterly report on Form 10-Q for the quarter ended March 30, 2024 . . . ."

***May 8, 2024 Form 10-Q***

113. On May 8, 2024, the Company filed a Form 10-Q with the SEC for the quarter ended on March 30, 2024 ("Q1 2024") (the "Q1 2024 10-Q"). The Q1 2024 10-Q was signed by Defendants Fitzpatrick and Beland. The attached SOX certifications were signed by Defendants Fitzpatrick and Ferrera and attested to the accuracy of the Q1 2024 10-Q and contained substantially the same statements as noted in ¶ 88.

114. The Q1 2024 10-Q reported that Q1 2024 net revenue "increased 2% [year-over-year] to $572 million, driven by same store sales and net store growth" and also reported the following Q1 2024 cash metrics:

| | | |
|---|---|---|
| Net change in cash, cash equivalents, restricted cash, and cash included in advertising fund assets, restricted | (6,084) | (34,014) |
| Cash and cash equivalents, beginning of period | 176,522 | 227,110 |
| Cash included in advertising fund assets, restricted, beginning of period | 38,537 | 32,871 |
| Restricted cash, beginning of period | 657 | 792 |
| Cash, cash equivalents, restricted cash, and cash included in advertising fund assets, restricted, beginning of period | 215,716 | 260,773 |
| Cash and cash equivalents, end of period | 165,513 | 190,841 |
| Cash included in advertising fund assets, restricted, end of period | 43,462 | 35,126 |
| Restricted cash, end of period | 657 | 792 |
| Cash, cash equivalents, restricted cash, and cash included in advertising fund assets, restricted, end of period | $ 209,632 | $ 226,759 |

115. Furthermore, the Q1 2024 10-Q reported Q1 2024 "Company-operated store expenses" of $242.053 million and "[s]elling, general, and administrative expenses" of $116.402 million.

116. The Q1 2024 10-Q further assured the investing public that there were "no changes in our internal control over financial reporting that occurred during the . . . quarter ended on March 30, 2024 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting."

***August 8, 2024 Form 10-Q***

117. On August 8, 2024, the Company filed a Form 10-Q with the SEC for the quarter ended on June 29, 2024 ("Q2 2024") (the "Q2 2024 10-Q"). The Q2 2024 10-Q was signed by Defendants Fitzpatrick and Beland. The attached SOX certifications were signed by Defendants Fitzpatrick and Beland and attested to the accuracy of the Q2 2024 10-Q and contained substantially the same statements as noted in ¶ 88.

118. The Q2 2024 10-Q highlighted that the Company "generated net revenue of approximately $612 million and $1.2 billion during the three and six months ended June 29, 2024, respectively, an increase of 1% compared to the prior comparative periods . . . ." The Q2 2024 10-Q further reported that the Company had a total net revenue of $606.851 million for the three months ended July 1, 2023, and $611.566 million for the three months ended June 29, 2024.

119. The Q2 2024 10-Q also emphasized that this revenue growth was "driven by higher product and service revenue due to an increase in system-wide sales and net new store growth."

120. The Q2 2024 10-Q also reported the Company's cash flow metrics for the six months ended on June 29, 2024, and July 1, 2023. It reported a beginning balance of $215.715 million and an ending balance of $185.236 million for the six months ended June 29, 2024. It

further reported a beginning balance of $260.773 million and an ending balance of $251.471 million for the six months ended July 1, 2023. Specifically, the Q2 2024 10-Q reported the following cash metrics for the aforementioned periods:

| | | |
|---|---|---|
| Net change in cash, cash equivalents, restricted cash, and cash included in advertising fund assets, restricted | (30,480) | (9,302) |
| Cash and cash equivalents, beginning of period | 176,522 | 227,110 |

8

| | | | |
|---|---|---|---|
| Cash included in advertising fund assets, restricted, beginning of period | | 38,537 | 32,871 |
| Restricted cash, beginning of period | | 657 | 792 |
| Cash, cash equivalents, restricted cash, and cash included in advertising fund assets, restricted, beginning of period | | 215,716 | 260,773 |
| Cash and cash equivalents, end of period | | 148,814 | 212,123 |
| Cash included in advertising fund assets, restricted, end of period | | 32,008 | 38,691 |
| Restricted cash, end of period | | 4,414 | 657 |
| Cash, cash equivalents, restricted cash, and cash included in advertising fund assets, restricted, end of period | $ | 185,236 | $ 251,471 |

121.    Furthermore, the Q2 2024 10-Q reported Q2 2024 "Company-operated store expenses" of $254.174 million and "[s]elling, general, and administrative expenses" of $121.123 million.

122.    The Q2 2024 10-Q also affirmed that there were "no changes in our internal control over financial reporting that occurred during the . . . quarter ended June 29, 2024 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting."

### November 7, 2024 Form 10-Q

123.    On November 7, 2024, the Company filed a Form 10-Q with the SEC for the quarter ended on September 28, 2024 ("Q3 2024") (the "Q3 2024 10-Q"). The Q2 2024 10-Q was signed by Defendants Fitzpatrick and Beland. The attached SOX certifications were signed by Defendants Fitzpatrick and Diamond and attested to the accuracy of the Q2 2024 10-Q and contained substantially the same statements as noted in ¶ 88.

124.    The Q3 2024 10-Q highlighted that the Company "generated net revenue of approximately $592 million and $1.8 billion during the three and nine months ended September

28, 2024, respectively, an increase of 2% and 1%, respectively, compared to the prior year comparative periods . . . ." The Q3 2024 10-Q reported a total net revenue for the three months ended September 30, 2023, and September 28, 2024, of $581.034 million and $591.679 million, respectively. The Q3 2024 10-Q explained that this increase was, in part, "driven by higher product and service revenue due to an increase in system-wide sales, net new store growth[.]"

125. The Q3 2024 10-Q also reported the following case metrics for the nine months ended September 28, 2024 and September 30, 2023, respectively:

| | | |
|---|---|---|
| Cash and cash equivalents, beginning of period | 176,522 | 227,110 |
| Cash included in advertising fund assets, restricted, beginning of period | 38,537 | 32,871 |
| Restricted cash, beginning of period | 657 | 792 |
| **Cash, cash equivalents, restricted cash, and cash included in advertising fund assets, restricted, beginning of period** | 215,716 | 260,773 |
| Cash and cash equivalents, end of period | 204,181 | 211,280 |
| Cash included in advertising fund assets, restricted, end of period | 40,465 | 47,877 |
| Restricted cash, end of period | 4,414 | 657 |
| **Cash, cash equivalents, restricted cash, and cash included in advertising fund assets, restricted, end of period** | $ 249,060 | $ 259,814 |

126. The Q3 2024 10-Q reported Q3 2024 "Company-operated store expenses" of $242.073 million and "[s]elling, general, and administrative expenses" of $1149.766 million.

127. Moreover, the Q3 2024 10-Q noted that "[w]ith the exception of the implementation of the ERP [enterprise resource planning] modules . . . there were no changes in our internal control over financial reporting that occurred during the . . . quarter ended September 28, 2024 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting."

***December 12, 2024 Form 8-K***

128. On December 12, 2024, the Company filed a Form 8-K with the SEC (the "December 2024 8-K") announcing that Defendant Beland was resigning from the Company. Specifically, the December 2024 8-K stated that Defendant Beland "informed the Company of his

intent to resign from his position, effective January 3, 2025, to pursue another opportunity."

**February 25, 2025 Form 8-K**

129. On February 25, 2025, the Company filed a form 8-K with the SEC (the February 2025 8-K") announcing the termination of Defendant Fitzpatrick's employment with the Company. Specifically, the February 2025 8-K stated that Defendant Fitzpatrick "informed the company of his intent to step down as President and CEO effective May 9, 2025[,]" and that Defendant Fitzpatrick "will remain on the Board of Directors of the Company [] as Non-Executive Chair of the Board."

**February 26, 2025 Form 10-K**

130. On February 26, 2025, the Company filed a Form 10-K with the SEC for Fiscal Year 2024 (the "2024 10-K"). The 2024 10-K was signed by Defendants Fitzpatrick, Diamond, Aronson, Tomás, Thompson, Hume, Halligan, Puckett, Stroup, Swinburn, and Harmon. The attached SOX certifications were signed by Defendants Fitzpatrick and Diamond and attested to the accuracy of the Q2 2024 10-Q and contained substantially the same statements as noted in ¶ 88.

131. The 2024 10-K reported the following regarding net revenue for the fiscal year ended December 28, 2024 and the fiscal year ended December 30, 2023:

| | Year Ended | | | |
|---|---|---|---|---|
| (in thousands) | December 28, 2024 | % of Net Revenues | December 30, 2023 | % of Net Revenues |
| Franchise royalties and fees | $ 188,634 | 8.1 % | $ 190,367 | 8.3 % |
| Company-operated store sales | 1,544,932 | 66.0 % | 1,526,353 | 66.2 % |
| Independently-operated store sales | 212,396 | 9.1 % | 196,395 | 8.5 % |
| Advertising fund contributions | 101,316 | 4.3 % | 98,850 | 4.3 % |
| Supply and other revenue | 292,310 | 12.5 % | 292,064 | 12.7 % |
| **Total net revenue** | $ 2,339,588 | 100.0 % | $ 2,304,029 | 100.0 % |

132. The 2024 10-K also provided the following cash metrics for Fiscal Year 2024:

| | | | |
|---|---:|---:|---:|
| **Net change in cash, cash equivalents, restricted cash, and cash included in advertising fund assets, restricted** | (6,474) | (45,057) | (302,019) |
| Cash and cash equivalents, beginning of period | 176,522 | 227,110 | 523,414 |
| Cash included in advertising fund assets, restricted, beginning of period | 38,537 | 32,871 | 38,586 |
| Restricted cash, beginning of period | 657 | 792 | 792 |
| **Cash, cash equivalents, restricted cash, and cash included in advertising fund assets, restricted, beginning of period** | 215,716 | 260,773 | 562,792 |
| Cash and cash equivalents, end of period | 169,954 | 176,522 | 227,110 |
| Cash included in advertising fund assets, restricted, end of period | 38,930 | 38,537 | 32,871 |
| Restricted cash, end of period | 358 | 657 | 792 |
| **Cash, cash equivalents, restricted cash, and cash included in advertising fund assets, restricted, end of period** | $ 209,242 | $ 215,716 | $ 260,773 |

133. The 2024 10-K reported Fiscal Year 2024 "Company-operated store expenses" of $993.090 million and "[s]elling, general, and administrative expenses" of $554.775 million.

134. Moreover, the 2024 10-K reported "[o]perating lease right-of-use assets" of $1.370 billion and $1.389 billion for Fiscal Years 2024 and 2023, respectively.

***2025 Proxy Statement***

135. On April 10, 2025, the Company filed the 2025 Proxy Statement with the SEC. Defendants Halligan, Puckett, Thompson, Aronson, Fitzpatrick, Tomás, Harmon, Hume, Stroup, and Swinburn solicited the 2025 Proxy Statement, pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

136. The 2025 Proxy Statement called for the Company's shareholders to vote, *inter alia*, to: (1) re-elect Defendants Halligan, Puckett, and Thompson to serve on the Board until the 2028 Annual Meeting of Stockholders; (2) approve, on an advisory basis, the compensation of the Company's named executive officers; and (3) ratify the appointment of PwC as the Company's independent registered public accounting firm for the fiscal year ending on December 27, 2025.

137.     Regarding the "Board's Oversight of Risk," the 2025 Proxy Statement stated that "[r]isk oversight is a critical aspect of the Company meeting its strategic objectives." It further provided the following:

**Board of Directors**
The Board of Directors executes its risk oversight responsibilities through active review and discussion of key risks facing the Company, including strategic risks, and by delegating certain risk oversight responsibilities to its committees, who regularly report back to the Board of Directors[.]

\*\*\*

**Audit Committee**
Oversees the management of financial risks, including accounting and financial reporting processes, internal controls and internal audit functions, the fraud risk assessment program, the enterprise risk management program, and other risk exposures, including data privacy and cybersecurity[.]

\*\*\*

**Compensation Committee**
Oversees the management of risks relating to the Company's compensation plans and arrangements[.]

\*\*\*

**Nominating & Corporate Governance Committee**
Oversees the management of risks related to the Company's corporate governance policies and practices and Board and executive-succession planning[.]

(Emphasis in the original.)

138.     Regarding the Code of Conduct, the 2025 Proxy Statement stated the following:

Our Board of Directors adopted a Code of Conduct and Ethics that applies to all our directors, officers, and employees and is intended to comply with the relevant listing requirements for a code of conduct as well as qualify as a "code of ethics" as defined by SEC rules. The Code of Conduct and Ethics contains general guidelines for conducting our business consistent with the highest standards of business ethics. Our Code of Conduct and Ethics is supported by underlying policies. The Code of Conduct and Ethics is available under the *Governance— Documents & Charters* section of our website at https://investors.drivenbrands.com.

139. Defendants Halligan, Puckett, Thompson, Aronson, Fitzpatrick, Tomás, Harmon, Hume, Stroup, and Swinburn caused the 2025 Proxy Statement to be false and misleading by failing to disclose, *inter alia*, that: (1) Driven had material weaknesses in its internal controls over financial reporting; (2) at least ten different categories of errors were widespread in the Company's financial reporting; (3) as a result, the Company's financial statements for Fiscal Years 2023 and 2024 and for the first three quarters of Fiscal Year 2025 contained material errors; (4) the affected statements would need to be restated and the filing of the Company's Annual Report on Form 10-K would be delayed; and (5) as a result of the foregoing, the Company's statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

140. The 2025 Proxy Statement also failed to disclose, *inter alia*, that: (1) although the 2025 Proxy Statement represented that the Company, its officers, and its directors adhered to the Code of Conduct, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2025 Proxy Statement's descriptions of the Board's and its committees' oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements. As a result, the Individual Defendants' statements during the Relevant Period were materially false and misleading at all relevant times.

141. As a result of Defendants Halligan, Puckett, Thompson, Aronson, Fitzpatrick, Tomás, Harmon, Hume, Stroup, and Swinburn causing the 2025 Proxy Statement to be false and misleading, the Company's shareholders voted, *inter alia*, to: (1) re-elect Defendants Halligan, Puckett, and Thompson to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company; (2) approve, on an advisory basis, the compensation of the Company's named executive officers; and (3) ratify the appointment of PwC as the Company's independent

registered public accounting firm for the fiscal year ending on December 27, 2025.

***May 8, 2025, Form 10-Q***

142.     On May 8, 2025, the Company filed a Form 10-Q with the SEC for the period ended March 29, 2025 ("Q1 2025") (the "Q1 2025 10-Q"). The Q1 2025 10-Q was signed by Defendants Fitzpatrick and Diamond. The attached SOX certifications were signed by Defendants Fitzpatrick and Diamond and attested to the accuracy of the Q1 2025 10-Q and contained substantially the same statements as noted in ¶ 88.

143.     The Q1 2025 10-Q highlighted that "Driven brands generated net revenue of approximately $516.2 million during the three months ended March 29, 2025, an increase of 7% compared to the prior year period . . . ." It further reported that the Company had a total revenue of $516.163 and $481.992 million for the three months ended March 29, 2025, and March 30, 2024, respectively. The Q1 2025 10-Q asserted that the increase in net revenue was "driven by company-operated store revenue, primarily due to net new store growth within our Take 5 segment and same store sales growth within our Take 5 and Car Wash segments."

144.     Moreover, the Q1 2025 10-Q reported the following cash metrics for the three months ended on March 29, 2025, and March 30, 2024, respectively:

| | | |
|---|---:|---:|
| Net change in cash, cash equivalents, restricted cash, and cash included in advertising fund assets, restricted | (15,099) | (6,084) |
| Cash and cash equivalents, beginning of period | 169,954 | 176,522 |
| Cash included in advertising fund assets, restricted, beginning of period | 38,930 | 38,537 |
| Restricted cash, beginning of period | 358 | 657 |
| Cash, cash equivalents, restricted cash, and cash included in advertising fund assets, restricted, beginning of period | 209,242 | 215,716 |
| Cash and cash equivalents, end of period | 155,584 | 165,513 |
| Cash included in advertising fund assets, restricted, end of period | 38,227 | 43,462 |
| Restricted cash, end of period | 332 | 657 |
| Cash, cash equivalents, restricted cash, and cash included in advertising fund assets, restricted, end of period | $ 194,143 | $ 209,632 |

145.     The Q1 2025 10-Q reported the Company's operating expenses for the three months

ended on March 29, 2025. It noted "Company-operated store expenses" of $181.866 million and "[s]elling, general, and administrative expenses" of $143.052 million.

146. Furthermore, the Q1 2025 10-Q purported that there "were no changes in our internal control over financial reporting . . . that occurred during the . . . quarter ended March 29, 2025 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting."

***August 7, 2025 Form 10-Q***

147. On August 7, 2025, the Company filed a Form 10-Q with the SEC for the quarter ended on June 28, 2025 ("Q2 2025") (the "Q2 2025 10-Q"). The Q2 2025 10-Q was signed by Defendants Rivera and Fondell. The attached SOX certifications were signed by Defendants Rivera and Diamond and attested to the accuracy of the Q2 2025 10-Q and contained substantially the same statements as noted in ¶ 88.

148. The Q2 2025 10-Q highlighted that "Driven Brands generated net revenue of approximately $551 million and $1.1 billion during the three and six months ended June 28, 2025, respectively, an increase of 6% and 7% compared to the prior year period." It also reported total net revenue of $550.988 million and $518.796 million for the three months ended June 28, 2025, and June 29, 2024, respectively. The Q2 2025 10-Q emphasized that the increase in net revenue was "driven by company-operated store sales, primarily due to net new store growth and same store sales growth within our Take 5 segment and independently-operated store sales due to same store sales growth within our Car Wash segment."

149. The Q2 2025 10-Q also reported the following cash metrics for the six months ended June 28, 2025, and June 29, 2024, respectively:

| | | |
|---|---:|---:|
| Net change in cash, cash equivalents, restricted cash, and cash included in advertising fund assets, restricted | (3,339) | (30,480) |
| Cash and cash equivalents, beginning of period | 169,954 | 176,522 |
| Cash included in advertising fund assets, restricted, beginning of period | 38,930 | 38,537 |
| Restricted cash, beginning of period | 358 | 657 |
| Cash, cash equivalents, restricted cash, and cash included in advertising fund assets, restricted, beginning of period | 209,242 | 215,716 |
| Cash and cash equivalents, end of period | 166,131 | 148,814 |
| Cash included in advertising fund assets, restricted, end of period | 39,438 | 32,008 |
| Restricted cash, end of period | 334 | 4,414 |
| Cash, cash equivalents, restricted cash, and cash included in advertising fund assets, restricted, end of period | $ 205,903 | $ 185,236 |

150. The Q2 2025 10-Q reported the Company's operating expenses for the year ended on June 28, 2025. It noted "Company-operated store expenses" of $190.396 million and "[s]elling, general, and administrative expenses" of $183.118 million.

151. Moreover, the Q2 2025 10-Q purported that there "were no changes in our internal control over financial reporting . . . that occurred during the . . . quarter ended June 28, 2025 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting."

***November 5, 2025 Form 10-Q***

152. On November 5, 2025, the Company filed a Form 10-Q with the SEC for the period ended on September 27, 2025 ("Q3 2025") (the "Q3 2025 10-Q"). The Q3 2025 10-Q was signed by Defendants Rivera and Fondell. The attached SOX certifications were signed by Defendants Rivera and Diamond and attested to the accuracy of the Q3 2025 10-Q and contained substantially the same statements as noted in ¶ 88.

153. The Q3 2025 10-Q highlighted that the Company had a "net revenue of approximately $536 million and $1.6 billion during the three and nine months ended September

27, 2025, respectively, an increase of 7% and 7% compared to the prior year period . . . ." Specifically it noted that, "[n]et revenue was $536 million for the three months ended September 27, 2025 compared to $502 million for the three months ended September 28, 2024."

154. Moreover, the Q3 2025 10-Q reported the following cash metrics for the nine months ended on September 27, 2025, and September 28, 2024, respectively:

| | | |
|---|---|---|
| Cash and cash equivalents, beginning of period | 169,954 | 176,522 |
| Cash included in advertising fund assets, restricted, beginning of period | 38,930 | 38,537 |
| Restricted cash, beginning of period | 358 | 657 |
| **Cash, cash equivalents, restricted cash, and cash included in advertising fund assets, restricted, beginning of period** | 209,242 | 215,716 |
| Cash and cash equivalents, end of period | 162,028 | 204,181 |
| Cash included in advertising fund assets, restricted, end of period | 41,361 | 40,465 |
| Restricted cash, end of period | 335 | 4,414 |
| **Cash, cash equivalents, restricted cash, and cash included in advertising fund assets, restricted, end of period** | $ 203,724 | $ 249,060 |

155. The Q3 2025 10-Q reported the Company's operating expenses for the year ended on September 27, 2025. It noted "Company-operated store expenses" of $191.129 million and "[s]elling, general, and administrative expenses" of $145.177 million.

156. Furthermore, the Q3 2025 10-Q represented that there "were no changes in our internal control over financial reporting . . . that occurred during the . . . quarter ended September 27, 2025 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting."

157. The statements in ¶¶ 84-102, 113-127, 130-134 and 142-156 above were materially false and misleading and failed to disclose, *inter alia*, that: (1) Driven had material weaknesses in its internal controls over financial reporting; (2) at least ten different categories of errors were widespread in the Company's financial reporting; (3) as a result, the Company's financial statements for Fiscal Years 2023 and 2024 and for the first three quarters of Fiscal Year 2025

contained material errors; (4) the affected statements would need to be restated and the filing of the Company's Annual Report on Form 10-K would be delayed; and (5) as a result of the foregoing, the Company's statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

## THE TRUTH EMERGES

### *February 25, 2026 Form 8-K*

158.    The truth emerged on February 25, 2026, when the Company filed a Form 8-K (the "Error Disclosure 8-K") with the SEC revealing that the "Audit Committee of the Board of Directors, after consultation with the Company's management, concluded that there were material errors" in the Company's financial statements for Fiscal Years 2023, and 2024, as well as each of the quarterly and year-to-date periods within fiscal year 2024 and the first three quarters and year-to-date periods of Fiscal Year 2025.

159.    In the Error Disclosure 8-K, the Company discussed "the primary categories of errors that have been identified in connection with the preparation" of its 2025 Form 10-K, stating the following:

*Lease Adjustments*

Certain errors were identified relating to the completeness and accuracy of recording leases. These errors primarily impact right of use assets and right of use liabilities recorded in the consolidated balance sheet as of December 28, 2024 and September 27, 2025.

*Cash Adjustments*

Certain errors were identified relating to unreconciled differences for cash accounts primarily originating in fiscal years 2023 and earlier. The errors affect the opening and ending cash balances and operating cash flows in the consolidated statement of cash flows and result in overstatements of cash and revenue and understatement of selling, general and administrative expense in the consolidated statement of operations for fiscal years 2023 and 2024.

*Expense Classification*

During fiscal years 2023 and 2024, within operating expenses certain supply and other expenses were presented as company-operated store expenses. This error resulted in company-operated store expenses to be overstated for fiscal years 2023 and 2024 and an equal understatement of supply and other expenses in the corresponding periods. This error did not result in any change in total operating expenses.

*Other Errors*

In addition, other errors were identified that primarily relate to fiscal years 2023 or 2024 related to the income tax provision, supply and other revenue, fixed assets, cloud computing, lease cash application, and balance sheet and income statement misclassifications, as well as inappropriately recognized revenue in our ATI business primarily related to fiscal year 2025. The impact of these errors and the lease adjustments, cash adjustments, and expense classification described above will be reflected in the Company's Annual Report on Form 10-K for the fiscal year 2025.

160. The Error Disclosure 8-K further disclosed that the Company's management "identified material weaknesses in the Company's internal control over financial reporting resulting in the conclusion that our internal control over financial reporting and disclosure controls and procedures were not effective as of December 27, 2025."

161. Moreover, the same day, the Company filed another 8-K (the "Delay Disclosure 8-K") with the SEC announcing it would delay the release of its fourth quarter and Fiscal Year 2025 financial results and earnings call. In particular, the Delay Disclosure 8-K acknowledged that the Company "previously disclosed that it would release its financial results for the fourth quarter and year ended December 27, 2025 before market open on February 25, 2026 and host a conference call at 8:30 a.m. ET to review the Company's financial and operating performance." However, due to the material errors in reporting, the timely release of its financial results was no longer possible.

162. On this news, the price of the Company's common stock fell $5.01 per share, or approximately 30.1%, from a closing price of $16.61 per share on February 24, 2026, to a closing

price of $11.60 per share on February 25, 2026.

**REPURCHASES DURING THE RELEVANT PERIOD**

163.     During the Relevant Period, the Individual Defendants caused the Company to initiate repurchases of its common stock that substantially damaged the Company. In total, the Company spent an aggregate amount of approximately $50 million to repurchase 3,601,694 shares of its own common stock at artificially inflated prices between August 2023 and September 2023.

164.     According to the Q3 2023 10-Q, between August 6, 2023, and September 2, 2023, the Company purchased 1,004,836 shares of its own common stock at an average price of $14.76 per share, for a total cost to the Company of approximately $14,831,379.

165.     As the Company's common stock was actually worth only $11.60 per share, the price at closing on February 25, 2026, the Company overpaid by approximately $3,175,282 for repurchases of its own common stock between August 6, 2023, and September 2, 2023.

166.     According to the Q3 2023 10-Q, between September 3, 2023, and September 30, 2023, the Company purchased 2,596,858 shares of its own common stock at an average price of $13.53 per share, for a total cost to the Company of approximately $35,135,489.

167.     As the Company's common stock was actually worth only $11.60 per share, the price at closing on February 25, 2026, the Company overpaid by approximately $5,011,936 for repurchases of its own common stock between September 3, 2023, and September 30, 2023.

168.     Thus, the Company overpaid for repurchases of its own common stock by approximately $8.2 million between August 2023 and September 2023.

**DAMAGES TO DRIVEN BRANDS**

169.     As a direct and proximate result of the Individual Defendants' conduct, Driven Brands will lose and expend many millions of dollars.

170. Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution of or to satisfy a judgment associated with the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

171. Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against the Company or the Individual Defendants based on the misconduct alleged herein and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

172. Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

173. Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company, including lucrative insider trading conducted by one of the Individual Defendants.

174. Furthermore, such losses include the Company's overpayment of approximately $8.2 million for repurchases of its own stock during the period when the Company's stock price was artificially inflated due to the false and misleading statements discussed above.

175. As a direct and proximate result of the Individual Defendants' conduct, Driven Brands has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations.

## <u>DERIVATIVE ALLEGATIONS</u>

176.     Plaintiff brings this action derivatively and for the benefit of Driven Brands to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Driven Brands, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and violations of the Exchange Act.

177.     Driven Brands is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

178.     Plaintiff is, and has been at all relevant times, a shareholder of Driven Brands. Plaintiff will adequately and fairly represent the interests of Driven Brands in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

179.     Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

180.     A pre-suit demand on the Board of Driven Brands is futile and, therefore, excused. At the time of filing of this complaint, the Board consists of the following twelve individuals: Defendants Fitzpatrick, Rivera, Halligan, Puckett, Thompson, Aronson, Tomás, Harmon, Hume, Stroup, Swinburn (the "Director Defendants"), and non-party Timothy Johnson (together with the Director Defendants, the "Directors"). Plaintiff needs only to allege demand futility as to six of the twelve Directors that were on the Board at the time of the filing of this complaint.

181.     Demand is excused as to all of the Director Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to cause the Company to make misleading statements and omissions of material fact, and at the same time overpay by $8.2 million for repurchases of its own

stock, all of which renders the Director Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

182. In complete abdication of their fiduciary duties, the Director Defendants either knowingly or recklessly caused or permitted Driven Brands to issue materially false and misleading statements. Specifically, the Director Defendants caused Driven Brands to issue false and misleading statements which were intended to make Driven Brands appear more profitable and attractive to investors. Moreover, the Director Defendants caused the Company to fail to maintain adequate internal controls. As a result of the foregoing, the Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

183. In addition, the Director Defendants cause the 2024 Proxy Statement to call for a shareholder vote to approve the Amended Incentive Plan, thereby increasing the number of shares available for issuance thereunder by 10,000,000 shares. The misrepresentations and omissions set forth herein were material to shareholders in voting to approve the Amended Incentive Plan, had they been informed about the Individual Defendants' misconduct. Before the shareholders approved the Amended Incentive Plan at the annual meeting of the stockholders on May 9, 2024, there were 4,751,995 shares available for issuance under the 2021 Incentive Plan. For this reason, the Individual Defendants, including the Director Defendants, have the opportunity to receive material personal benefits that they otherwise would not receive but for the issuance of the 2024 Proxy Statement and the shareholders approving the Amended Incentive Plan that made the additional 10,000,000 shares available. As such, the Director Defendants face a substantial likelihood of liability and demand is futile as to them.

184. Additional reasons that demand on Defendant Fitzpatrick is futile follow.

Defendant Fitzpatrick has served on the Company's Board since April 2021. As of May 9, 2025, he has served as the Board's Non-Executive Chair. He previously served as the Company's President and CEO from July 2012 to May 2025. Defendant Fitzpatrick receives sizable compensation for his role as a Company director. As a trusted Company director, he conducted little, if any, oversight into the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, during the Relevant Period, he failed to correct the false and misleading statements alleged herein and personally made many of the false and misleading statements alleged herein. Defendant Fitzpatrick also signed the false and misleading 2023 10-K/A and 2024 10-K. Additionally, Defendant Fitzpatrick also solicited the 2024 Proxy Statement which was materially false and misleading and resulted in the shareholders voting, *inter alia*, to: (1) re-elect Defendants Aronson, Tomás, and himself to serve on the Board until the 2027 Annual Meeting of Stockholders, thereby allowing them to continue breaching their fiduciary duties to the Company, and (2) to approve the Amended Incentive Plan, thereby allowing the Individual Defendants to materially benefit thereunder in the future. Defendant Fitzpatrick also solicited the 2025 Proxy Statement which was materially false and misleading and resulted in the shareholders voting, *inter alia*, to re-elect Defendants Halligan, Puckett, and Thompson to serve on the Board until the 2028 Annual Meeting of Stockholders, thereby allowing them to continue breaching their fiduciary duties to the Company. Moreover, Defendant Fitzpatrick's insider sales, made with the knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme. Furthermore, Defendant Fitzpatrick is a defendant in the Securities Class Action. For these reasons, Defendant Fitzpatrick

breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and therefore excused.

185.    Additional reasons that demand on Defendant Rivera is futile follow. Defendant Rivera has served on the Company's Board and as the Company's President and CEO since May 2025. As such, the Company provides Defendant Rivera with his principal occupations for which he receives lucrative compensation. Thus, as the Company admits, he is a non-independent director. As the Company's highest officer, he conducted little, if any, oversight the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, during the Relevant Period, he failed to correct the false and misleading statements alleged herein. Defendant Rivera also solicited the 2025 Proxy Statement, which was materially false and misleading and resulted in shareholders voting, *inter alia*, to re-elect Defendants Halligan, Puckett, and Thompson to serve on the Board until the 2028 Annual Meeting of Stockholders, thereby allowing them to continue breaching their fiduciary duties to the Company. Furthermore, Defendant Rivera is a defendant in the Securities Class Action. For these reasons, Defendant Rivera breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and therefore excused.

186.    Additional reasons that demand on Defendant Halligan is futile follow. Defendant Halligan has served on the Company's Board since December 2020. She also serves as a member of the Nominating and Corporate Governance Committee and as Chair of the Compensation Committee. Defendant Halligan receives sizable compensation for her role as a Company director. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the

Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. In addition, during the Relevant Period, she failed to correct the false and misleading statements alleged herein. Defendant Halligan also signed the false and misleading 2024 10-K. Additionally, Defendant Halligan solicited the 2024 Proxy Statement which was materially false and misleading and resulted in the shareholders voting, *inter alia*, to: (1) re-elect Defendants Aronson, Tomás, and Fitzpatrick to serve on the Board until the 2027 Annual Meeting of Stockholders, thereby allowing them to continue breaching their fiduciary duties to the Company; and (2) approve the Amended Incentive Plan, thereby allowing the Individual Defendants to materially benefit thereunder in the future. In this regard, Defendant Halligan is eligible to receive stock awards under the Amended Incentive Plan. Defendant Halligan also solicited the 2025 Proxy Statement which was materially false and misleading and resulted in shareholders voting, *inter alia*, to re-elect Defendants Puckett, Thompson, and herself to serve on the Board until the 2028 Annual Meeting of Stockholders, thereby allowing them to continue breaching their fiduciary duties to the Company. Moreover, Defendant Halligan's insider sales, made with the knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate her motive in facilitating and participating in the scheme. For these reasons, Defendant Halligan breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and therefore excused.

187. Additional reasons that demand on Defendant Puckett is futile follow. Defendant Puckett has served on the Company's Board since December 2020. He also serves as a member of the Compensation Committee and as Chair of the Audit Committee. Defendant Puckett receives

sizable compensation for his role as a Company director. As a trusted Company director, he conducted little, if any, oversight into the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, during the Relevant Period, he failed to correct the false and misleading statements alleged herein. Defendant Puckett also signed the false and misleading 2024 10-K. Additionally, Defendant Puckett solicited the 2024 Proxy Statement which was materially false and misleading and resulted in the shareholders voting, *inter alia*, to: (1) re-elect Defendants Aronson, Tomás, and Fitzpatrick to serve on the Board until the 2027 Annual Meeting of Stockholders, thereby allowing them to continue breaching their fiduciary duties to the Company, and (2) to approve the Amended Incentive Plan, thereby allowing the Individual Defendants to materially benefit thereunder in the future. In this regard, Defendant Puckett is eligible to receive stock awards under the Amended Incentive Plan. Defendant Puckett also solicited the 2025 Proxy Statement which was materially false and misleading and resulted in the shareholders voting, *inter alia*, to re-elect Defendants Halligan, Thompson, and himself to serve on the Board until the 2028 Annual Meeting of Stockholders, thereby allowing them to continue breaching their fiduciary duties to the Company. For these reasons, Defendant Puckett breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and therefore excused.

188. Additional reasons that demand on Defendant Thompson is futile follow. Defendant Thompson has served on the Company's Board since December 2020. Defendant Thompson was designated to the Board by the Company's Principal Stockholders. Thus, as the Company admits, he is a non-independent director. Defendant Thompson receives sizable

compensation for his role as a Company director. As a trusted Company director, he conducted little, if any, oversight into the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, during the Relevant Period, he failed to correct the false and misleading statements alleged herein. Defendant Thompson also signed the false and misleading 2024 10-K. Additionally, Defendant Thompson solicited the 2024 Proxy Statement which was materially false and misleading and resulted in the shareholders voting, *inter alia*, to: (1) re-elect Defendants Aronson, Tomás, and Fitzpatrick to serve on the Board until the 2027 Annual Meeting of Stockholders, thereby allowing them to continue breaching their fiduciary duties to the Company, and (2) to approve the Amended Incentive Plan, thereby allowing the Individual Defendants to materially benefit thereunder in the future. In this regard, Defendant Thompson is eligible to receive stock awards under the Amended Incentive Plan. Defendant Thompson also solicited the 2025 Proxy Statement which was materially false and misleading and resulted in the shareholders voting, *inter alia*, to re-elect Defendants Halligan, Puckett, and himself to serve on the Board until the 2028 Annual Meeting of Stockholders, thereby allowing them to continue breaching their fiduciary duties to the Company. For these reasons, Defendant Thompson breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and therefore excused.

189. Additional reasons that demand on Defendant Aronson is futile follow. Defendant Aronson has served on the Company's Board since December 2020. Defendant Aronson was designated to the Board by the Company's Principal Stockholders. Thus, as the Company admits, he is a non-independent director. Defendant Aronson receives sizable compensation for his role as

a Company director. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, during the Relevant Period, he failed to correct the false and misleading statements alleged herein. Defendant Aronson also signed the false and misleading 2024 10-K. Additionally, Defendant Aronson solicited the 2024 Proxy Statement which was materially false and misleading and resulted in the shareholders voting, *inter alia*, to: (1) re-elect Defendants Tomás, Fitzpatrick, and himself to serve on the Board until the 2027 Annual Meeting of Stockholders, thereby allowing them to continue breaching their fiduciary duties to the Company, and (2) to approve the Amended Incentive Plan, thereby allowing the Individual Defendants to materially benefit thereunder in the future. In this regard, Defendant Aronson is eligible to receive stock awards under the Amended Incentive Plan. Defendant Aronson also solicited the 2025 Proxy Statement which was materially false and misleading and resulted in shareholders voting, *inter alia*, to re-elect Defendants Halligan, Puckett, and Thompson to serve on the Board until the 2028 Annual Meeting of Stockholders, thereby allowing them to continue breaching their fiduciary duties to the Company. For these reasons, Defendant Aronson breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and therefore excused.

190. Additional reasons that demand on Defendant Hume is futile follow. Defendant Hume has served on the Company's Board since December 2020. Defendant Hume was designated to the Board by the Company's Principal Stockholders. Thus, as the Company admits, he is a non-independent director. Defendant Hume receives sizable compensation for his role as a Company director. As a trusted Company director, he conducted little, if any, oversight into the scheme to

cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, during the Relevant Period, he failed to correct the false and misleading statements alleged herein. Defendant Hume also signed the false and misleading 2024 10-K. Additionally, Defendant Hume solicited the 2024 Proxy Statement which was materially false and misleading and resulted in the shareholders voting, *inter alia*, to: (1) re-elect Defendants Tomás, Fitzpatrick, and Aronson to serve on the Board until the 2027 Annual Meeting of Stockholders, thereby allowing them to continue breaching their fiduciary duties to the Company, and (2) to approve the Amended Incentive Plan, thereby allowing the Individual Defendants to materially benefit thereunder in the future. In this regard, Defendant Hume is eligible to receive stock awards under the Amended Incentive Plan. Defendant Hume also solicited the 2025 Proxy Statement which was materially false and misleading and resulted in shareholders voting, *inter alia*, to re-elect Defendants Halligan, Puckett, and Thompson to serve on the Board until the 2028 Annual Meeting of Stockholders, thereby allowing them to continue breaching their fiduciary duties to the Company. For these reasons, Defendant Hume breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and therefore excused.

191.    Additional reasons that demand on Defendant Tomás is futile follow. Defendant Tomás has served on the Company's Board since July 2022. He also serves as a member of the Compensation Committee and the Nominating and Corporate Governance Committee. Defendant Tomás receives sizable compensation for his role as a Company director. As a trusted Company director, he conducted little, if any, oversight into the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over

reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, during the Relevant Period, he failed to correct the false and misleading statements alleged herein. Defendant Tomás also signed the false and misleading 2024 10-K. Additionally, Defendant Tomás solicited the 2024 Proxy Statement which was materially false and misleading and resulted in the shareholders voting, *inter alia*, to: (1) re-elect Defendants Fitzpatrick, Aronson, and himself, to serve on the Board until the 2027 Annual Meeting of Stockholders, thereby allowing them to continue breaching their fiduciary duties to the Company, and (2) to approve the Amended Incentive Plan, thereby allowing the Individual Defendants to materially benefit thereunder in the future. In this regard, Defendant Tomás is eligible to receive stock awards under the Amended Incentive Plan. Defendant Tomás also solicited the 2025 Proxy Statement which was materially false and misleading and resulted in the shareholders voting, *inter alia*, to re-elect Defendants Halligan, Puckett, and Thompson to serve on the Board until the 2028 Annual Meeting of Stockholders, thereby allowing them to continue breaching their fiduciary duties to the Company. For these reasons, Defendant Tomás breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and therefore excused.

192. Additional reasons that demand on Defendant Harmon is futile follow. Defendant Harmon has served on the Company's Board since January 2024. He also serves as a member of the Compensation Committee. Defendant Harmon receives sizable compensation for his role as a Company director. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, during the Relevant

Period, he failed to correct the false and misleading statements alleged herein. Defendant Harmon also signed the false and misleading 2024 10-K. Additionally, Defendant Harmon solicited the 2024 Proxy Statement which was materially false and misleading and resulted in the shareholders voting, *inter alia*, to: (1) re-elect Defendants Fitzpatrick, Aronson, and Tomás, to serve on the Board until the 2027 Annual Meeting of Stockholders, thereby allowing them to continue breaching their fiduciary duties to the Company, and (2) to approve the Amended Incentive Plan, thereby allowing the Individual Defendants to materially benefit thereunder in the future. In this regard, Defendant Harmon is eligible to receive stock awards under the Amended Incentive Plan. Defendant Harmon also solicited the 2025 Proxy Statement which was materially false and misleading and resulted in the shareholders voting, *inter alia*, to re-elect Defendants Halligan, Puckett, and Thompson to serve on the Board until the 2028 Annual Meeting of Stockholders, thereby allowing them to continue breaching their fiduciary duties to the Company. For these reasons, Defendant Harmon breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and therefore excused.

193. Additional reasons that demand on Defendant Stroup is futile follow. Defendant Stroup has served on the Company's Board since December 2020. She also serves as a member of the Compensation Committee and Audit Committee. Defendant Stroup receives sizable compensation for her role as a Company director. As a trusted Company director, she conducted little, if any, oversight into the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. In addition, during the Relevant Period, she failed to correct the false and misleading statements alleged herein. Defendant Stroup also signed the false and misleading 2024 10-K. Additionally,

Defendant Stroup solicited the 2024 Proxy Statement which was materially false and misleading and resulted in the shareholders voting, *inter alia*, to: (1) re-elect Defendants Fitzpatrick, Aronson, and Tomás, to serve on the Board until the 2027 Annual Meeting of Stockholders, thereby allowing them to continue breaching their fiduciary duties to the Company, and (2) to approve the Amended Incentive Plan, thereby allowing the Individual Defendants to materially benefit thereunder in the future. In this regard, Defendant Stroup is eligible to receive stock awards under the Amended Incentive Plan. Defendant Stroup also solicited the 2025 Proxy Statement which was materially false and misleading and resulted in the shareholders voting, *inter alia*, to re-elect Defendants Halligan, Puckett, and Thompson to serve on the Board until the 2028 Annual Meeting of Stockholders, thereby allowing them to continue breaching their fiduciary duties to the Company. For these reasons, Defendant Stroup breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and therefore excused.

194. Additional reasons that demand on Defendant Swinburn is futile follow. Defendant Swinburn has served on the Company's Board since December 2020. He also serves as a member of the Audit Committee and as Chair of the Nominating and Corporate Governance Committee. Defendant Swinburn receives sizable compensation for his role as a Company director. As a trusted Company director, he conducted little, if any, oversight into the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, during the Relevant Period, he failed to correct the false and misleading statements alleged herein. Defendant Swinburn also signed the false and misleading 2024 10-K. Additionally, Defendant Swinburn solicited the 2024 Proxy Statement which was

materially false and misleading and resulted in the shareholders voting, *inter alia*, to: (1) re-elect Defendants Fitzpatrick, Aronson, and Tomás, to serve on the Board until the 2027 Annual Meeting of Stockholders, thereby allowing them to continue breaching their fiduciary duties to the Company, and (2) to approve the Amended Incentive Plan, thereby allowing the Individual Defendants to materially benefit thereunder in the future. In this regard, Defendant Swinburn is eligible to receive stock awards under the Amended Incentive Plan. Defendant Swinburn also solicited the 2025 Proxy Statement which was materially false and misleading and resulted in the shareholders voting, *inter alia*, to re-elect Defendants Halligan, Puckett, and Thompson to serve on the Board until the 2028 Annual Meeting of Stockholders, thereby allowing them to continue breaching their fiduciary duties to the Company. For these reasons, Defendant Swinburn breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and therefore excused.

195. Additional reasons that demand on the Board is futile follow.

196. Defendants Puckett (as Chair), Stroup, and Swinburn (collectively, the "Audit Committee Defendants") served as members of the Audit Committee at all relevant times. As such, they were responsible for the effectiveness of the Company's internal controls, the truth and accuracy of the Company's financial statements, and the Company's compliance with applicable laws and regulations. During the Relevant Period, they violated the Audit Committee Charter by engaging in or permitting the Company to engage in the dissemination of materially false and misleading statements to the public and to facilitate the Individual Defendants' violations of law, including breaches of fiduciary duty and violations of the Exchange Act; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and

procedures, and the Code of Conduct. Thus, the Audit Committee Defendants breached their fiduciary duties, are not independent or disinterested, and thus demand is excused as to them.

197. In violation of the Code of Conduct, the Director Defendants engaged in or permitted the scheme to cause the Company to issue materially false and misleading statements to the investing public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. In addition, the Individual Defendants violated the Code of Conduct by failing to act with integrity; failing to avoid conflicts of interest; failing to ensure the Company's disclosures were accurate; failing to ensure the Company complied with applicable laws, rules, and regulations; and failing to promptly report known violations of the Code of Conduct and the law. Thus, the Director Defendants breached the Company's own Code of Conduct, are not disinterested, and demand is excused as to them.

198. Driven Brands has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director Defendants have not filed any lawsuits against the Individual Defendants or others who were responsible for that wrongful conduct to attempt to recover for Driven Brands any part of the damages Driven Brands suffered and will continue to suffer thereby. Thus, any demand upon the Director Defendants would be futile.

199. The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and are not capable of exercising

independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

200. The acts complained of herein constitute violations of fiduciary duties owed by Driven Brands's officers and directors, and these acts are incapable of ratification.

201. The Director Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Driven Brands. If there is a directors' and officers' liability insurance policy covering the Director Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director Defendants were to sue themselves or certain of the officers of Driven Brands, there would be no directors' and officers' insurance protection. Accordingly, the Director Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director Defendants is futile and, therefore, excused.

202. If there is no directors' and officers' liability insurance, then the Director Defendants will not cause Driven Brands to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

203. Thus, for all of the reasons set forth above, all of the Director Defendants, and, if not all of them, at least six of the Directors, cannot consider a demand with disinterestedness and

independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM
**Against the Individual Defendants for Violations of
Section 20(a) of the Exchange Act**

204.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

205.    The Individual Defendants, by virtue of their positions with Driven Brands and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of Driven Brands and each of its officers and directors who made the false and misleading statements alleged herein within the meaning of § 20(a) of the Exchange Act. The Individual Defendants had the power and influence and exercised the same to cause Driven Brands to engage in the illegal conduct and practices complained of herein.

206.    Plaintiff, on behalf of Driven Brands, has no adequate remedy at law.

## SECOND CLAIM
**Against the Individual Defendants for Violations of
Section 10(b) and Rule 10b-5 of the Exchange Act**

207.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

208.    The Individual Defendants participated in a scheme to defraud with the purpose and effect of defrauding Driven Brands. Not only is Driven Brands now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also one of the largest victims of the unlawful schemes perpetrated upon Driven Brands by the Individual Defendants. With the price of its common stock trading at artificially inflated prices due to the Individual Defendants' misconduct, the Individual Defendants caused the Company to repurchase its own shares at artificially inflated prices, damaging Driven Brands.

209. During the Relevant Period, the Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's press releases, public statements, and periodic and current reports filed with the SEC.

210. The Individual Defendants employed devices, schemes, and artifices to defraud while in possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Driven Brands not misleading.

211. The Individual Defendants, as top executives and directors of the Company, are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as directors and officers of the Company, the Individual Defendants were able to and did control the conduct complained of herein and the content of the public statements disseminated by Driven Brands.

212. The Individual Defendants acted with scienter during the Relevant Period, in that they either had actual knowledge of the scheme and the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the scheme set forth herein and for the false and misleading statements and/or omissions disseminated to the public through filings with the SEC.

213. By virtue of the foregoing, the Individual Defendants have violated §10(b) of the

Exchange Act, and Rule 10b-5 promulgated thereunder.

214. Plaintiff, on behalf of Driven Brands, has no adequate remedy at law.

## THIRD CLAIM
### Against Defendants Halligan, Puckett, Thompson, Aronson, Fitzpatrick, Tomás. Harmon, Hume, Stroup, and Swinburn for Violations of Section 14(a) of the Exchange Act

215. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

216. Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

217. Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

218. Under the direction and watch of Defendants Halligan, Puckett, Thompson, Aronson, Fitzpatrick, Tomás, Harmon, Hume and Swinburn, the 2024 Proxy Statement failed to disclose that: (1) though the Company claimed its officers and directors adhered to the Code of Conduct, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2024 Proxy Statement's descriptions of the

Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

219. The 2024 Proxy Statement was also materially misleading because it failed to disclose, *inter alia*, that: (1) Driven had material weaknesses in its internal controls over financial reporting; (2) at least ten different categories of errors were widespread in the Company's financial reporting; (3) as a result, the Company's financial statements for Fiscal Years 2023 and 2024 and for the first three quarters of Fiscal Year 2025 contained material errors; (4) the affected statements would need to be restated and the filing of the Company's Annual Report on Form 10-K would be delayed; and (5) as a result of the foregoing, the Company's statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

220. Defendants Halligan, Puckett, Thompson, Aronson, Fitzpatrick, Tomás, Harmon, Hume, and Swinburn knew or recklessly disregarded that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2024 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to shareholders in voting on the matters set forth for shareholder determination in the 2024 Proxy Statement, including but not limited to, the re-election of directors.

221. The false and misleading elements of the 2024 Proxy Statement led Company shareholders to vote to, *inter alia*: (1) re-elect Defendants Aronson, Fitzpatrick, and Tomás to serve on the Board until the 2027 Annual Meeting of Stockholders, thereby allowing them to continue breaching their fiduciary duties to the Company; (2) approve, on an advisory basis, the compensation of the Company's named executive officers; (3) approve the Amended Incentive Plan, thereby allowing the Individual Defendants to materially benefit thereunder in the future;

and (4) ratify PwC as the Company's independent registered public accounting firm for Fiscal Year 2024.

222. The Company was damaged as a result of Defendants Halligan's, Puckett's Thompson's, Aronson's, Fitzpatrick's, Tomás's, Harmon's, Hume's, Stroup's, and Swinburn's material misrepresentations and omissions in the 2024 Proxy Statement.

223. Under the direction and watch of Defendants Halligan, Puckett, Thompson, Aronson, Fitzpatrick, Tomás, Harmon, Hume, and Swinburn, the 2025 Proxy Statement failed to disclose that: (1) though the Company claimed its officers and directors adhered to the Code of Conduct, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2025 Proxy Statement's descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

224. The 2025 Proxy Statement was also materially misleading because it failed to disclose, *inter alia*, that: (1) Driven had material weaknesses in its internal controls over financial reporting; (2) at least ten different categories of errors were widespread in the Company's financial reporting; (3) as a result, the Company's financial statements for Fiscal Years 2023 and 2024 and for the first three quarters of Fiscal Year 2025 contained material errors; (4) the affected statements would need to be restated and the filing of the Company's Annual Report on Form 10-K would be delayed; and (5) as a result of the foregoing, the Company's statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

225. Defendants Halligan, Puckett, Thompson, Aronson, Fitzpatrick, Tomás, Harmon, Hume, and Swinburn knew or recklessly disregarded that by misrepresenting or failing to disclose

the foregoing material facts, the statements contained in the 2025 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to shareholders in voting on the matters set forth for shareholder determination in the 2025 Proxy Statement, including but not limited to, the re-election of directors.

226. The false and misleading elements of the 2025 Proxy Statement led Company shareholders to vote to, *inter alia*: (1) re-elect Defendants Halligan, Puckett, and Thompson to serve on the Board until the 2028 Annual Meeting of Stockholders, thereby allowing them to continue breaching their fiduciary duties to the Company; (2) approve, on an advisory basis, the compensation of the Company's named executive officers; and (3) ratify PwC as the Company's independent registered public accounting firm for Fiscal Year 2025.

227. The Company was damaged as a result of Defendant Halligan's, Puckett's Thompson's, Aronson's, Fitzpatrick's, Tomás's, Harmon's, Hume's, Stroup's, and Swinburn's material misrepresentations and omissions in the 2025 Proxy Statement.

228. Plaintiff, on behalf of Driven Brands, has no adequate remedy at law.

**FOURTH CLAIM**
**Against the Individual Defendants for Breach of Fiduciary Duties**

229. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

230. Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Driven Brands's business and affairs.

231. Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

232. The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual

Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Driven Brands.

233. In breach of their fiduciary duties owed to Driven Brands, the Individual Defendants willfully or recklessly caused the Company to make false and misleading statements and/or omissions of material fact that failed to disclose, *inter alia*, that: (1) Driven had material weaknesses in its internal controls over financial reporting; (2) at least ten different categories of errors were widespread in the Company's financial reporting; (3) as a result, the Company's financial statements for Fiscal Years 2023 and 2024 and for the first three quarters of Fiscal Year 2025 contained material errors; (4) the affected statements would need to be restated and the filing of the Company's Annual Report on Form 10-K would be delayed; and (5) as a result of the foregoing, the Company's statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

234. In further breach of their fiduciary duties, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact referenced herein, which renders them personally liable to the Company for breaching their fiduciary duties.

235. Also in breach of their fiduciary duties, the Individual Defendants failed to maintain adequate system of oversight, disclosure controls and procedures, and internal controls.

236. In yet further breach of their fiduciary duties, during the Relevant Period, the Individual Defendants willfully or recklessly caused the Company to repurchase shares of its own common stock at artificially inflated prices before the fraud was exposed, while two of the Individual Defendants engaged in lucrative insider sales, netting proceeds of approximately $3.4 million.

237. The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly issue materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Driven Brands's securities.

238. The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

239. These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

240. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Driven Brands has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

241. Plaintiff, on behalf of Driven Brands, has no adequate remedy at law.

## FIFTH CLAIM
### Against the Individual Defendants for Unjust Enrichment

242. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

243. By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Driven Brands.

244. The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Driven Brands that was tied to the performance or artificially inflated valuation of Driven Brands or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct.

245. Plaintiff, as a shareholder and a representative of Driven Brands, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

246. Plaintiff, on behalf of Driven Brands, has no adequate remedy at law.

## SIXTH CLAIM
### Against the Individual Defendants for Abuse of Control

247. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

248. The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Driven Brands, for which they are legally responsible.

249. As a direct and proximate result of the Individual Defendants' abuse of control, Driven Brands has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

250. Plaintiff, on behalf of Driven Brands, has no adequate remedy at law.

## SEVENTH CLAIM
### Against the Individual Defendants for Gross Mismanagement

251. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

252. By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Driven Brands in a manner consistent with the operations of a publicly held corporation.

253. As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Driven Brands has sustained and will continue to sustain significant damages.

254. As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

255. Plaintiff, on behalf of Driven Brands, has no adequate remedy at law.

## EIGHTH CLAIM
### Against the Individual Defendants for Waste of Corporate Assets

256. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

257. The Individual Defendants caused the Company to pay the Individual Defendants excessive salaries and fees, to the detriment of the shareholders and the Company.

258. In addition, the Individual Defendants caused the Company to repurchase shares of its own common stock at artificially inflated prices, thereby wasting the Company's assets.

259. As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused Driven Brands to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

260. As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

261. Plaintiff, on behalf of Driven Brands, has no adequate remedy at law.

**NINTH CLAIM**
**Against Defendants Fitzpatrick, Rivera, Beland, Ferrera, Diamond, and Fondell for Contribution Under Sections 10(b) and 21D of the Exchange Act**

262. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

263. Driven Brands and Defendants Fitzpatrick, Rivera, Beland, Ferrera, Diamond, and Fondell are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Fitzpatrick's, Rivera's, Beland's, Ferrera's, Diamond's, and Fondell's willful and/or reckless violations of their obligations as officers and/or directors of Driven Brands.

264. Defendants Fitzpatrick, Diamond, Beland, Rivera, Fondell, and Ferrera, because of their positions of control and authority as officers and/or directors of Driven Brands, were able to

and did, directly and/or indirectly, exercise control over the business and corporate affairs of Driven Brands, including the wrongful acts complained of herein and in the Securities Class Action.

265. Accordingly, Defendants Fitzpatrick, Diamond, Beland, Rivera, Fondell, and Ferrera are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

266. As such, Driven Brands is entitled to receive all appropriate contribution or indemnification from Defendants Fitzpatrick, Diamond, Beland, Rivera, Fondell, and Ferrera.

## **PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a) Declaring that Plaintiff may maintain this action on behalf of Driven Brands, and that Plaintiff is an adequate representative of the Company;

(b) Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Driven Brands;

(c) Determining and awarding to Driven Brands the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d) Directing Driven Brands and the Individual Defendants to take all necessary actions to reform and improve Driven Brands's corporate governance and internal procedures to comply with applicable laws and to protect Driven Brands and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or

Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of Driven Brands to nominate at least six candidates for election to the Board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)     Awarding Driven Brands restitution from the Individual Defendants, and each of them;

(f)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)     Granting such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated: April 29, 2026                                        Respectfully submitted,

**HAUSLER LAW FIRM, PLLC**

*/s/ Kurt F. Hausler*
Kurt F. Hausler
NC Bar No. 22103
524 East Boulevard
Charlotte, NC 28203
Telephone: (704) 247-3255
Fax: (704) 247-3267
Email: khausler@hauslerlaw.com

**THE BROWN LAW FIRM, P.C.**
Timothy Brown
767 Third Avenue, Suite 2501
New York, NY 10017
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

*Counsel for Plaintiff*

Docusign Envelope ID: 3AC522D7-BE40-8477-8383-4B496028212D

## **VERIFICATION**

I, Daniel Terwilliger, am a plaintiff in the within action. I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 22nd day of April 2026.

Signed by:

*Daniel Terwilliger*

DE3D20C6F638417...

Daniel Terwilliger